IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FILED _____ ENTERED
_____ LOGGED _____ RECEIVED

DEC 23 2025

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

| | |
|---|---|
| DOUGLAS FURLONG,<br>VARIETAL BEER COMPANY,<br>VORTEX BREWING CO., LLC, | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | *   Civil Action No. RDB-23-2045 |
| | * |
| THE HON. ANTHONY G. BROWN,<br>*Attorney General of Maryland*,<br>JEFFREY A. KELLY, *Executive Director*,<br>*Maryland Alcohol, Tobacco, and Cannabis*<br>*Commission*, | * |
| | * |
| | * |
| Defendants. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

RICHARD D. BENNETT, Senior District Judge.

1

## I.    Introduction

This federal constitutional challenge to Maryland statutes regulating direct-to-consumer beer delivery addresses the State's authority to regulate alcohol within its borders by restricting the rights of out-of-state producers. It implicates the balance between two distinct provisions of the United States Constitution. Under the Commerce Clause, U.S. CONST. art. I § 8, cl. 3, states implicitly lack authority to burden interstate commerce by discriminating against out-of-state commercial interests. Yet, Section Two of the Twenty-First Amendment, U.S. CONST. amend. XXI § 2, affords states broad authority to regulate alcohol that crosses within their borders. In 2021 and 2024, the State of Maryland acted at the intersection of these two constitutional provisions by enacting laws[1] that allow permitted in-state breweries to deliver their beer directly to consumers but prohibit out-of-state breweries from engaging in such delivery. Maryland resident Douglas J. Furlong ("Mr. Furlong") and out-of-state breweries Varietal Beer Company ("Varietal") and Vortex Brewing Company, LLC ("Vortex") (collectively, "Plaintiffs") challenge the 2024 version of this law on the basis that it exceeds Maryland's authority under the Twenty-First Amendment and the dormant Commerce Clause doctrine by unconstitutionally discriminating against out-of-state breweries without serving public health and safety or any other legitimate, nonprotectionist interest.

There is essentially no dispute that the challenged law discriminates against interstate commerce. Thus, the State of Maryland must justify the law as a public health or safety measure or on some other legitimate, nonprotectionist ground. After extensive briefing and

---

[1] As explained further below, for clarity, this Court refers to the challenged laws as the Direct Delivery Law.

a two-day trial, the State has failed to do so. Maryland authorizes out-of-state wine producers to ship their products to Maryland consumers. Out-of-state beer producers should be permitted to do the same. Accordingly, JUDGMENT shall be entered in favor of the Plaintiffs and the State shall be ENJOINED from enforcing the Direct Delivery Law against out-of-state breweries.

On July 21, 2023, Plaintiffs[2] initiated this action by filing in this Court a one-Count Complaint against Defendants Anthony G. Brown, in his official capacity as Attorney General of the State of Maryland ("Attorney General Brown"); Jeffrey A. Kelly, in his official capacity as Executive Director of the Maryland Alcohol, Tobacco, and Cannabis Commission ("Mr. Kelly"); and several members of the Maryland Alcohol Tobacco and Cannabis Commission ("ATCC"). This Court dismissed the claim as to members of the ATCC but denied dismissal of the claim against Attorney General Brown and Mr. Kelly (collectively, "Defendants" or "the State").[3] *See* (ECF No. 14). Plaintiffs then filed the operative, two-Count Amended Complaint (ECF No. 35), in which they challenge the 2024 version of the Direct Delivery Law. Although all parties agreed at the summary judgment stage that the challenged statutes discriminate against out-of-state commercial interests and present a purely legal issue, they submitted just eight exhibits to support their requests for summary judgment. *See* (ECF No. 64-1 at 3). Following a hearing and request for supplemental briefing, this Court in its discretion denied the parties' cross-motions for summary judgment based on the scant factual

---

[2] Originally, Plaintiffs also included Mirage Beer Company, which was dismissed from this matter by Stipulation (ECF No. 44) on November 25, 2024. *See* (ECF No. 45).

[3] As stated on the record at trial, and with consent of the parties, the Court refers to Attorney General Brown and Mr. Kelly, interchangeably as "Defendants" or "the State." (ECF No. 105 at 4:11–12, 7:14–16.)

evidence in the record. (ECF Nos. 64-1, 65.) Accordingly, this case proceeded to a two-day bench trial beginning on Monday, December 8, 2025, and concluding on Tuesday, December 9, 2025.

After consideration of the evidence and argument presented at that bench trial, this Court concludes that Defendants have not met their burden to demonstrate that Maryland's discriminatory Direct Delivery Law serves public health and safety safety or some other legitimate, nonprotectionist interest. At trial, Defendants submitted limited evidence that under-age and propensity drinkers consume beer at higher rates than other types of alcohol such that beer may require greater regulation. Similarly, they presented expert testimony that allowing out-of-state breweries to deliver directly to Maryland consumers could harm the market by increasing beer supply, decreasing prices, and inhibiting the State's ability to collect alcohol taxes. Finally, they presented testimony from Mr. Kelly that the challenged laws reflect the General Assembly's policy decision and the ATCC's limited resources. Such general concerns about underage drinking and economic interests cannot justify facially discriminatory laws that prohibit direct-to-consumer beer delivery by out-of-state producers while permitting such delivery for in-state producers. Nor can such concerns justify the implicitly discriminatory law that requires all direct-to-consumer delivery to occur via a brewery's own employees, rather than by common carrier. Accordingly, Defendants have not met their burden under the Commerce Clause and Section Two of the Twenty-First Amendment. As explained further below, JUDGMENT SHALL BE ENTERED IN FAVOR OF PLAINTIFFS. Plaintiffs' request for declaratory judgment and an injunction is GRANTED as stated in the attached Judgment.

## II.    Parties & Procedural History

### A.  Parties

Plaintiffs Douglas J. Furlong ("Mr. Furlong"), Varietal Beer Company ("Varietal"), and Vortex Brewing Company, LLC ("Vortex") (collectively, "Plaintiffs") are an individual Maryland resident and two out-of-state breweries. (ECF No. 109 at 1; ECF No. 105 at 61:7–8; 59:4–11 (Mr. Furlong).)   Mr. Furlong lives in Maryland and considers himself a "beer tourist" because he visits breweries in various states, including Virginia, Delaware, and others. (ECF No. 105 at 62:22–63:2 (Mr. Furlong).)   He became interested in purchasing for direct delivery beer from out-of-state breweries such as Vortex, Varietal, and Dogfish Head. (*Id.* at 63:10–64:4 (Mr. Furlong).)   Vortex is a small, craft brewery located in New Freedom, Pennsylvania, several miles from the Maryland border, and it is prepared to directly deliver beer to Maryland consumers. (*Id.* at 59:4–6; 73:8–9.)   Varietal is a brewery located in Sunnyside, Washington. (*Id.* at 59:7–8.)

Defendants Attorney General Brown and Mr. Kelly are authorized under Maryland law to enforce violations under the challenged statutes.  In his capacity as Executive Director of the Maryland Alcohol Tobacco and Cannabis Commission ("ATCC"), Mr. Kelly oversees the regulation and licensure of alcohol and entities involved in production, distribution, and sale of alcohol in the State of Maryland. (*Id.* at 191:25–192:1; 192:16–23.)  Defendants are sued in their official capacities. (*Id.* at 7:14–20.)

### B. Procedural History

Plaintiffs[4] initiated this civil action on July 31, 2023, by filing in this Court a one-Count Complaint (ECF No. 1) alleging a violation of the Commerce Clause, Art. I, § 8, cl. 3, of the United States Constitution against Attorney General Brown; Mr. Kelly; and several ATCC Commissioners ("Commissioner Defendants") in their official capacities (collectively, "Original Defendants"). (ECF No. 1.) Original Defendants moved to dismiss (ECF No. 8), and this Court by Memorandum Order (ECF No. 14) dated March 15, 2024, granted dismissal as to Commissioner Defendants,[5] but denied dismissal as to Attorney General Brown and Mr. Kelly. *See* (ECF No. 14 at 10). During the 2024 legislative session, the General Assembly enacted new versions of the statutes that Plaintiffs challenged in their original Complaint. *See generally* MD. CODE ANN., ALC. BEVS. & CANNABIS §§ 2-167–2-175. Plaintiffs then filed the operative, two-Count Amended Complaint (ECF No. 35) alleging against Attorney General Brown and Mr. Kelly commerce clause violation for discriminatory delivery privileges (Count I) and commerce clause violation for the discriminatory effect of the shipping ban (Count II). *See* (ECF No. 35-1 (Redlined Amended Complaint)). Defendants filed their Answer (ECF No. 38) to the Amended Complaint, and following the conclusion of discovery, (ECF No. 42), the parties filed cross-motions for summary judgment. (ECF Nos. 43, 52.)

This Court held a hearing on the parties' cross-motions for summary judgment and after oral argument from both parties, ordered supplemental briefing on the issues of public health and safety and the three-tier regulatory system. (ECF No. 61 at 39:5–43:2, 44:8–24;

---

[4] As noted above, original Plaintiffs also included Mirage Brewing Company, which was dismissed from this action by Stipulation of Dismissal (ECF No. 44) on November 25, 2024. (ECF No. 45.)

[5] Plaintiffs consented to dismissal of Commissioner Defendants on the basis that they were not proper defendants in this action seeking declaratory and injunctive relief. (ECF No. 14 at 2 & n.1).

ECF No. 60.)    After reviewing the supplemental briefing, this Court denied summary judgment to both parties based on the skeletal evidentiary record. (ECF Nos. 64-1, 65.) This case proceeded to a two-day bench trial that concluded on December 9, 2025.  By consent, the parties dispensed with opening and closing arguments at trial.  The Court heard testimony from six witnesses, including a *de bene esse* deposition and approximately 65 exhibits.  Based on the evidence admitted at trial, the Court now makes the following finds of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## III.    Trial Findings of Fact

### A. Finding of Fact: Maryland regulates alcohol in three tiers.

Maryland regulates alcohol in part by separating the alcohol market into three tiers: (1) manufacturers or producers; (2) wholesalers; and (3) retailers. (ECF No. 105 at 27:10–22 (Ms. Durbin).)  Generally, entities and individuals cannot operate within or across more than one tier, and a manufacturer must sell to a wholesaler, which in turn must sell to a retailer. (ECF No. 105 at 209:7–13 (Mr. Kelly).)  Maryland does not limit the amount of alcohol that a manufacturer may sell to a wholesaler, a wholesaler may sell to a retailer, or a retailer may sell to a consumer.  (ECF No. 106 at 56:1–22 (Mr. Kelly).)  For manufacturers, selling to a wholesaler or retailer is more expensive than selling directly to a consumer: on average, wholesalers mark up the price of alcohol by 21 percent and retailers by an additional 25 percent. DE32 ¶ 47.  In part for this reason, smaller manufacturers may have difficulty finding and maintaining wholesale distribution.  (ECF No. 105 at 88:14–24 (Mr. Baum).)

In Maryland, the first two tiers of the system—manufacturing and wholesale—are licensed at the state level, while counties and local jurisdictions license entities within the retail

7

tier. (*Id.* at 28:24–29:1 (Durbin).)    Generally, the State of Maryland licenses in-state manufacturers and permits out-of-state manufacturers. (*Id.* at 85:6–11 (Mr. Kelly).)  That is, a "permit" applies either to an out-of-state manufacturer *or* to an enhancement to in-state manufacturer's license, while a "license" applies solely to an in-state manufacturer. (*Id.* at 85:6–11 (Mr. Kelly).)  Maryland does not require beer manufacturers to maintain a presence within the state to be able to sell their products to in-state consumers. (*Id.* at 48:6–10 (Ms. Durbin).)    Many large beer manufacturers such as Anheuser Bush maintain production facilities outside the state but sell their products to Maryland consumers via in-state retailers. (*Id.* at 48:6–10 (Ms. Durbin).)    There are approximately 14,000 beer producers or manufacturers in the United States, and there are 140 breweries within the State of Maryland. (ECF No. 106 at 84:19 (Mr. Kelly); ECF No. 106 at 144:11–14.)

This three-tier regulatory system exists in part to promote public health and safety by (1) preventing inter-tier collusion between entities in the alcohol market and (2) enabling regulators to track alcohol products to guarantee product safety and taxation.[6]  (ECF No. 105 at 28:3–6 (Ms. Durbin), at 209:10–24 (Mr. Kelly).)  The three-tier system prevents collusion— both in the form of illicit dealmaking and strong-arming—between manufacturers and retailers by requiring all alcohol products to pass through every tier. (*Id.* at 205:6–206:3 (Mr. Kelly).)  The wholesale tier thus acts as a buffer that forces separation between manufacturers and retailers and decreases the risk of improper inter-tier collaboration. (*Id.* at 205:19–207:12 (Mr. Kelly).)  Maryland enforces the three-tier system through strict recordkeeping requirements

---

[6] As Mr. Kelly explained, the tier-system arose in part to address market behaviors common before the passage of the Twenty-First Amendment. (ECF No. 105 at 206:23–207:20 (Mr. Kelly)); *see also* PE19 (ATCC webpage discussing three-tier system).

that allow its Alcohol Tobacco and Cannabis Commission ("ATCC") to track alcohol as it moves through licensed and/or permitted entities at each tier. (*Id.* at 208:2–12); *see, e.g.,* DE04 (Application for Manufacturer or Wholesaler's License); DE15 (ATCC Manufacturer and Wholesaler Compliance Inspection Form); DE18 (Pre-license Inspection Form).) These recordkeeping requirements allow state regulators to confirm both that products are safe for consumption and that entities have made required tax payments for their products. (ECF No. 105 at 207:22–208:12 (Mr. Kelly) (discussing role of recordkeeping in three-tier regulatory system).)

### B. Finding of Fact: Maryland authorizes three exceptions to its three-tier system of alcohol regulation.

Notwithstanding its general adherence to a three-tier system of regulation, Maryland authorizes three formal exceptions to this system.[7] (ECF No. 105 at 204:1–16 (Mr. Kelly).) First, it authorizes manufacturers to sell directly to consumers in person by allowing breweries to sell to consumers who are present at their premises. (*Id.* at 204:1–8 (Mr. Kelly).) Second, as discussed further below, Maryland has authorized a direct shipping permit through which

---

[7] At trial, the parties adduced evidence of two additional deviations from the traditional flow of alcohol under this system. First, Maryland authorizes third parties such as Doordash to deliver beer to customers at the discretion and approval of local liquor boards. (ECF No. 105 at 48:15–25 (Ms. Durbin).) The evidence and testimony presented at trial, however, suggested that no local liquor board has yet authorized such third-party distribution, although third-party services may advertise alcohol that is then delivered by an employee of the advertising, licensed retailer. (*Id.* at 48:15–49:6, 51:24–52:6 (Ms. Durbin)); PE36.

Second, although Maryland's three-tier system generally requires manufacturers to sell only to wholesalers, PE 19, Maryland authorizes permitted out-of-state beer manufacturers that produce fewer than 22,500 barrels per year to sell directly to Maryland retailers. (ECF No. 105 at 204:21–23 (Mr. Kelly).) Plaintiff Vortex holds one of these permits and uses it to sell its beer to consumers in Maryland. (*Id.* at 73:8–10, 82:11–16, 83:1–3 (Mr. Foard).) Varietal has not applied for this permit, although its beer production renders it eligible to apply for such a permit. (*Id.* at 80:20–21; 84:17–19, 89:22–90:6 (Mr. Baum).) Mr. Furlong has not attempted to determine whether he would be able to arrange for delivery of out-of-state beer via a local Maryland retailer. (*Id.* at 71:20–72:4 (Mr. Furlong).)

in-state and out-of-state wineries may ship wine directly to Maryland consumers using a common carrier. (*Id.* at 204:9–12 (Mr. Kelly).) Third, under the Direct Delivery Law challenged in this case, it authorizes in-state beer manufacturers to directly deliver beer to in-state consumers using their own employees rather than common carriers. (*Id.* at 204:12–16 (Mr. Kelly).) Under this third exception, in-state breweries may deliver no more than 12 cases of beer—or 288 12-ounce cans or bottles—to the same address in one year. (ECF No. 106 at 20:13–25, 57:25–58:14, 73:6–14 (Mr. Kelly).) Importantly, Maryland law defines "shipment" as conveyance to consumers by common carrier and "delivery" as conveyance to consumers by an entity's own employees. *See* (*Id.* at 185:24–186:4 (Dr. Kerr) (distinguishing shipping from delivery); at 21:8–18, 59:12–22 (Mr. Kelly) (explaining definitions of shipping and delivery)). The direct wine shipping permit and direct beer delivery permit exceptions are discussed in further detail below.

### i. Exception: Maryland allows in-state and out-of-state wineries to directly ship wine to consumers in the State using common carriers.

In 2011, the Maryland General Assembly by statute created a direct wine shipping permit, which authorizes permitted in-state and out-of-state wineries to ship wine directly to consumers using common carriers. (ECF No. 106 at 58:15–59:23, 64:11–65:5 (Mr. Kelly).) Before establishing this permit, the General Assembly commissioned the Comptroller of Maryland to produce a report regarding the likely effects of direct wine shipments. (*Id.* at 37:11–23 (Mr. Kelly)); DE05, DE06. To receive and maintain a direct wine shipping permit, a winery must (1) consent to warrantless searches by the Alcohol Tobacco and Cannabis Commission ("ATCC"); (2) submit records to the ATCC; (3) label products and packages; (4) use a common carrier permitted in Maryland; and (5) post a $1,000 bond to ensure payment

of state taxes. (ECF No. 106 at 62:4–63:18, 64:12–18, 66:16–70:25, 72:5–21 (Mr. Kelly)); PE15 at 3 ¶ 4c (Direct Wine Shipper's Permit Information and Application); DE06 (Maryland Winery Modernization Act). Maryland permits common carriers for direct wine shipping based in part on their submission of the training they have provided to their drivers, including training as to age-verification practices. (ECF No. 106 at 62:4–63:20 (Mr. Kelly).) Importantly, however, Maryland does *not* require such permitted common carriers to demonstrate that employees have completed alcohol awareness training. (*Id.* at 63:14–20 (Mr. Kelly).) Nor do Maryland authorities conduct inspections of out-of-state wineries that have obtained direct-wine shipping permits. (*Id.* at 66:16–18 (Mr. Kelly).)

        ii. **Exception: Maryland's Direct Delivery Law permits in-state but not out-of-state breweries to deliver beer directly to Maryland consumers via their own employees.**

    Under the statutes challenged in this case, Maryland allows eligible in-state breweries to obtain a permit that enhances their manufacturer licenses by allowing them to directly deliver their beer to in-state consumers. *See* (ECF No. 105 at 85:6–11 (Mr. Kelly)); DE12 (Direct Delivery Permit Application). As an initial matter, Maryland provides several licenses for beer manufacturers: (1) Class 5 Brewery licenses; (2) Class 6 Pub-Brewery licenses; (3) Class 7 Micro-Brewery licenses; and (4) Class 8 Farm Brewery licenses. *See* DE04 at 1 (Application for Manufacturer's and Wholesaler's Licenses); (ECF No. 105 at 208:24–25, 216:3–5 (Mr. Kelly)). Only three of these classes of licensees—Class 5, Class 7, and Class 8— are eligible to apply for a direct-delivery permit under the laws challenged in this case. (ECF No. 105 at 216:3–5 (Mr. Kelly).) Of the 140 breweries within the State of Maryland, "only a handful" have obtained direct-delivery beer permits. (ECF No. 106 at 84:13–16 (Mr. Kelly).)

11

Importantly, any manufacturer seeking to apply for a direct-delivery permit under the challenged statutes must be "eligible to receive a class seven limited wholesale license, which is a license that allows them to distribute their own product" provided that they (1) do not produce more than 45,000 barrels a year; (2) comply with distribution restrictions; (3) deliver via their own employees; (4) make face-to-face delivery during which they check the recipient's identification card to verify that person's age; and (5) label their packaging to state that the package contains alcohol and someone 21 or older must sign for it. (ECF No. 105 at 216:6–23 (Mr. Kelly)); DE10 (Direct Delivery Form). To be eligible to receive a Class 7 limited wholesale license, a manufacturer must have an in-state presence. PE16 (ATCC Alcohol Compliance Bulletin); DE07 (ATCC Trade Practices Reference Guide). Accordingly, out-of-state breweries are not eligible to receive direct delivery permits under the challenged laws.[8] (ECF No. 106 at 60:24–61:5 (Mr. Kelly).) Between 2021 and 2024, direct delivery permit holders could ship their beer to consumers via common carrier, but under the statutes challenged in this case, permit holders can no longer effectuate delivery via common carrier. (ECF No. 106 at 78:2–5 (Mr. Kelly).)

Employees who provide direct delivery must have completed an approved, third-party alcohol awareness training program. (ECF No. 105 at 218:9–219:7 (Mr. Kelly).) Such programs teach attendees how to recognize the signs of overconsumption and verify a consumer's age. (*Id.* at 218:17–219:7 (Mr. Kelly).) This requirement seeks to prevent delivery or sale of alcohol to minors and to individuals who have overconsumed. (*Id.* at 219:7–23 (Mr.

---

[8] As explained above, Maryland distinguishes "delivery" of alcohol from "shipping" of alcohol. "Shipping" refers to transporting alcohol to consumers by using a common-carrier, while "delivery" refers to transport of alcohol to consumers not by common-carrier.

Kelly).)  At least some of the approved alcohol awareness programs can be completed online and do not include an in-person component.  (ECF No. 106 at 55:14, 55:18 (Mr. Kelly).) Defense witnesses expressed that the alcohol awareness training requirement reduces the risk of delivery to underage consumers.  (ECF No. 105 at 219:8–23 (Mr. Kelly).)

> C. **Finding of Fact: The Alcohol, Tobacco, and Cannabis Commission licenses alcohol manufacturers and wholesalers and enforces state alcohol laws in Maryland.**

Although all breweries nationwide must obtain a basic federal permit to operate, (ECF No. 106 at 70:4–25 (Mr. Kelly)), the Maryland Alcohol Tobacco and Cannabis Commission ("ATCC") licenses beer manufacturers to operate within the State of Maryland, oversees permits for manufacturers and wholesalers, and enforces licensure and permitting laws.  (ECF No. 105 at 192:16–23, 192:17–21 (Mr. Kelly).)  It oversees approximately 8,500 licensees and permitholders, (ECF No. 106 at 48:3–9 (Mr. Kelly)), and serves public health and safety by enforcing the three-tier system throughout the state.  (ECF No. 105 at 194:2–12 (Mr. Kelly).) Defendant Kelly is the Executive Director of the ATCC, in which capacity he oversees all ATCC units, including its trade practices and licensing units.  (*Id.* at 191:23–197:24 (Mr. Kelly).)  The ATCC's enforcement activity centers on pre-licensure inspections, unannounced inspections of licensed or permitted entities, corresponding suspension or revocation of licenses or permits, and recordkeeping requirements.

> i. **Licensing and Permitting of Manufacturers**

Manufacturers seeking licensure in Maryland begin by completing an application, DE04, and submitting it to the ATCC.  (ECF No. 105 at 209:1–24 (Mr. Kelly).)  During its initial review of such applications, the ATCC determines whether the manufacturer has any

relationship with a wholesaler or retailer and whether it possess the required zoning and health approvals.   (*Id.* at 211:7–212:6 (Mr. Kelly).)    Additionally, the ATCC inspects the manufacturer's premises to determine that (1) it has the required equipment; (2) it has secure storage areas for alcohol products and required production and distribution records; and (3) its product labels comply with the statutory requirement that alcohol by volume ("ABV") of beers with an ABV above 4.5% is "large and conspicuous" on the label.   (*Id.* at 211:4–214:20 (Mr. Kelly)); *see also* MD. CODE ANN., ALC. BEVS. & CANNABIS § 1-307(b)(2).  The ATCC inspects for secure storage locations to ensure that products are not at risk of tampering or contamination, while it monitors records to enforce Maryland's three-tier system.  (ECF No. 105 at 212:22–213:10 (Mr. Kelly).)

### 1. The ATCC imposes recordkeeping requirements on its licensees and permit-holders.

For licensed manufacturers who also hold direct-beer delivery permits under the challenged laws, the ATCC's review of records includes review of delivery records.  (ECF No. 106 at 16:3–15 (Mr. Kelly)); DE10 (Direct Delivery Form), DE11 (Direct Delivery Annual Reporting Form).   Direct-delivery permit holders are required to maintain the following records: (1) a direct delivery form for each delivery they make to a consumer, DE10; and (2) a form compiling all direct deliveries, which is submitted to the ATCC annually, DE11.  (ECF No. 105 at 217:13–15, 218:1–2, 218:8 (Mr. Kelly); ECF No. 106 at 80:14–20 (Mr. Kelly).) Manufacturers must maintain direct delivery forms for each delivery they make for three years following the date of the delivery.  DE 10; (ECF No. 105 at 217:18 (Mr. Kelly).)  Additionally, permit-holders are required to report to the ATCC quarterly delivery logs that include (1) the

product sold; (2) the type and volume of alcohol sold; and (3) the name and address of the recipient. PE16 (Alcohol Compliance Bulletin).

### 2. The ATCC enforces state laws by inspecting licensees and permit-holders to ensure compliance.

The ATCC conducts unannounced inspections of licensed alcohol manufacturers in Maryland at least once every year. (ECF No. 105 at 210:7–13, 223:22–224:6 (Mr. Kelly)); *see, e.g.,* DE09 (Compliance Inspection Report); DE21 (Compliance Inspection Report). Although the ATCC enjoys state statutory authority for unannounced, warrantless inspections, manufacturers also consent to such inspections in their license application. (ECF No. 105 at 210:7–19 (Mr. Kelly)); DE04 (Manufacturer's and Wholesaler's License Application); MD. CODE ANN., ALC. BEVS. & CANNABIS §§ 6-201, 6-202 (discussing inspections). During inspections, ATCC officials (1) examine beer labels, including new or modified labels to inspect for compliance with Maryland's labeling requirements; (2) evaluate manufacturing facilities and equipment for cleanliness and sanitation; and (3) review records for orderliness and completeness. (ECF No. 106 at 5:10–6:16, 6:18–7:17, 7:22–25, 81:11–19 (Mr. Kelly)); *see also* DE07 (listing items inspected at beer manufacturers); DE15 (same). For manufacturers that possess direct-delivery permits, inspections include review of delivery records. (ECF No. 106 at 16:3–15 (Mr. Kelly).)

Separately, the ATCC also conducts unannounced, warrantless inspections of licensed wholesalers in Maryland. (ECF No. 106 at 16:18–18:9 (Mr. Kelly).) These inspections allow the ATCC to review the wholesalers' records to verify that manufacturers have properly paid excise taxes for alcohol that they produce in Maryland or ship into Maryland. (*Id.* at 16:18–18:9 (Mr. Kelly).) Additionally, unannounced inspections of wholesalers allow ATCC to

confirm that alcohol flows through each tier of the three-tier system. (*Id.* at 17:1–9 (Mr. Kelly).)

Unannounced inspections serve public health and safety by encouraging compliance with ATCC licensure requirements because non-compliant licensees may have their licenses suspended or revoked. (ECF No. 105 at 221:18–222:25, 223:1–12 (Mr. Kelly), at 22:20–35:1 (Ms. Durbin), at 178:9–13 (Mr. Kuhr); ECF No. 106 at 18:10–19:7 (Mr. Kelly); DE32 ¶¶ 31, 35 (Dr. Kerr Report).) The ATCC enjoys broad authority to sanction non-compliance—including failure to keep orderly, complete, or proper records—by suspending or revoking licenses. (ECF No. 106 at 9:8–13; 10:22–11:8 (Mr. Kelly)); *see e.g.,* DE17 (suspending direct wine shipping permit for noncompliance); DE14 (Notice of Suspension of Licenses). Specifically, it may revoke or suspend a manufacturing license for any violation of state alcohol laws or to otherwise "promote the peace or safety of the community in which the premises are located," including for sale of alcohol to minors. MD. CODE ANN., ALC. BEVS. & CANNABIS § 3-603(a); (ECF No. 106 at 11:18–24 (Mr. Kelly)). Mr. Kelly does not believe that the ATCC has authority to inspect beer manufacturers in other states but, even if it did, it lacks the resources to inspect the nearly 14,000 breweries across the United States. (ECF No. 106 at 66:16–18, 89:24–90:1 (Mr. Kelly)); PE21 (Department of Treasury, Brewery Count by State).

### a. Inspections uncover violations of state alcohol laws.

Via inspections, the ATCC has uncovered violations of state alcohol laws and potentially dangerous products. For example, Mr. Kelly testified that the ATCC has issued cease and desist letters to out-of-state wineries that ship wine into Maryland without the

required direct wine shipper's permit.  (ECF No. 105 at 220:10-221:14 (Mr. Kelly)); DE08 (Cease and Desist Letter); DE16 (ATCC Letter to Amazon).  Similarly, the ATCC has sanctioned recordkeeping violations by suspending at least one beer manufacturer's license based on failure to keep records.  (ECF No. 106 at 9:24-10:21 (Mr. Kelly)); DE14.  That beer manufacturer subsequently submitted the required delinquent records.  (ECF No. 106 at 10:16-21 (Mr. Kelly).)  Finally, inspections have uncovered alcohol products containing unknown ingredients, alcohol products from unknown sources, and alcohol products exposed to fire damage.  (*Id.* at 12:7-13:4; 13:4-16:2, 51:24-52:6 (Mr. Kelly)); DE21; DE24.  Some of these inspections occur at the retail site, rather than at the manufacturer.  *See* (ECF No. 106 at 13:12–23; 14:1–8 (Mr. Kelly) (discussing inspection of festival that uncovered unlicensed sales of sangria with deficient label and unknown ingredients)); DE21; DE24; (ECF No. 106 at 15:1–21, 15:24; 16:2 (Mr. Kelly) (describing unannounced inspection of retailer that resulted in seizure of product of unknown origins)).

Relatedly, ATCC inspections have exposed instances in which common carriers improperly delivered alcohol to in-state consumers without observing age-verification procedures.  (ECF No. 106 at 31:5-34:9 (Mr. Kelly)); DE13 at 5; DE16; DE 16A; DE20; DE20A.  In some instances, United Parcel Service and Amazon delivery personnel delivered a package of wine and beer, respectively, without age verification despite the package being marked to contain alcohol.  DE20, DE20A; DE16, DE16A; DE13 at 5.  Mr. Kelly testified that he does not believe that training common carrier personnel regarding alcohol delivery would alleviate concerns of shipment of alcohol to underage drinkers because such individuals

belong to large companies that lack connection to the local community. (ECF No. 106 at 28:22-30:7 (Mr. Kelly).)

### b. The ATCC refers health code violations to local health regulators and has no role in product recalls.

Although the ATCC enforces state alcohol laws via its licensing and inspection requirements, *see, e.g.* DE 19, it relies on local health and zoning boards to enforce health codes and has no formal role in product recalls. (ECF No. 106 at 81:20–82:2 (Mr. Kelly).) As explained above, Mr. Kelly testified that part of the licensing process includes confirming that manufacturers possess the required zoning and health permits from the appropriate zoning and health authorities. (*Id.* at 81:20–82:2 (Mr. Kelly).) Similarly, the ATCC has no official role in product recalls, which are conducted by the manufacturer, local or state health agencies, and the federal Food and Drug Administration ("FDA") and Tax and Trade Bureau ("TTB"). (ECF No. 105 at 146:15–16, 154:11–14, 158:6, 158:2–21 (Mr. Kuhr); ECF No. 106 at 79:1–9 (Mr. Kelly) (acknowledging ATCC has no "official" role or "legal obligation" during product recalls). Rather, Mr. Kelly testified that the ATCC has an important role in magnifying existing recalls by publicizing them to licensees, trade organizations, and other stakeholders that subscribe to ATCC communications. (ECF No. 106 at 45:12–46:7 (Mr. Kelly).) Mr. Kelly acknowledged that out-of-state entities may subscribe to ATCC communications. (*Id.* at 80:8–13 (Mr. Kelly)); *see* DE19.

### D. Finding of Fact: Mr. Furlong, Vortex, and Varietal have attempted to engage in direct delivery of beer but have been unable to do so under current Maryland laws.

Within the existing statutory scheme regulating alcohol in Maryland, Mr. Furlong has been unable to order beer from out-of-state breweries, including Vortex and Varietal, for

direct delivery to his home. (ECF No. 105 at 61:23–65:21, 69:15–19 (Mr. Furlong).) Vortex and Varietal are regulated by their respective states and follow practices recommended by national and state brewers associations. (*Id.* at 75:3–11 (Mr. Foard (Vortex)); at 87:10–20 (Mr. Baum (Varietal)).) Mr. Furlong separately contacted Vortex and Varietal via email regarding specific beers he was interested in purchasing and both responded that they could not ship or deliver such beer to his home under existing Maryland law. (*Id.* at 62:11–16, 64:19–65:7, 65:13–21 (Mr. Furlong).) As noted above, unlike Varietal, Vortex has obtained a permit to ship its beer directly to retailers in Maryland. (*Id.* at 73:8–10, 82:11–16, 83:1–3 (Mr. Foard).) Additionally, due to Vortex's proximity to Maryland, it is prepared to use its own employees to directly deliver its beer if authorized by law, while Varietal would use a common carrier to directly ship beer if authorized by law. (*Id.* at 59:7–11 (Stipulation Four).)

### E. Finding of Fact: Permitting direct-to-consumer delivery by out-of-state breweries does not impair Maryland's interests in collection of taxes and preservation of public health and safety.

#### i. The Parties' Experts

Plaintiffs presented expert testimony from Mr. Kuhr, a qualified expert regarding food manufacturing and safety, who has more than forty-one years of experience in food and product safety. PE02; PE01. Mr. Kuhr, who has an associate's degree in business and a Bachelor of Science in Business Administration and Management, testified based on his experience overseeing beer and beverage production for several breweries to ensure safety in manufacturing. *See* PE02. He is a past president of the Master Brewer's Association of the Americas, maintains ongoing affiliation with several brewing and distilling professional associations, and has authored some articles regarding beverage manufacturing. *Id.*; DE03.

He provided general testimony regarding the food safety concerns associated with beer manufacturing but did not opine on alcohol-related public health and safety issues.

Defendants presented expert testimony from economist Dr. Kerr, a qualified expert in alcohol-related health and social problems, alcohol policy, and alcohol taxation policy, who testified broadly regarding the economic impact of policies that affect the price of alcohol. (ECF No. 106 at 116:8–15 (Dr. Kerr).) Dr. Kerr holds a Doctor of Economics but presently works as a senior scientist at the Alcohol Research Group within the Public Health Institute and part-time associate researcher at the University of California, Berkeley. *See* (*id.* at 94:11–16, 97:23–24 (Dr. Kerr)). His work and research centers on substance use issues associated with alcohol, including leading a health project focused on the relationship between alcohol consumption and health problems. *See generally* (*id.* at 94:11–110:1, 111:3–116:15 (Dr. Kerr).) He has written numerous articles regarding public health effects of alcohol consumption and alcohol tax policies. *See, e.g.*, DE45, DE59, DE61, DE62. Dr. Kerr also testified generally regarding known public health and safety concerns associated with alcohol, which the Court considered to be common knowledge not within his expertise. He did not conduct any economic modeling but rather testified based on economic theory derived from his expertise, research, and review of other studies. (ECF No. 106 at 158:7–159:18, 160:4–15, 160:22–161:7 (Dr. Kerr).)

### ii. Defendants have not shown that direct delivery of beer from out-of-state producers would impair the State's interest in tax collection.

Under Maryland's three-tier system of regulating alcohol, manufacturers are required to pay Maryland taxes on beer. (ECF No. 106 at 117:10–12 (Mr. Kelly); at 152:25–153:1 (Dr. Kerr).) Maryland charges an excise tax of nine cents per gallon of beer, a general sales tax of

six percent, and an additional sales tax of three percent for alcohol products. (*Id.* at 173:13–16 (Dr. Kerr).) Thus, Maryland taxes alcohol at a total rate of nine percent. (*Id.* at 175:8–9 (Dr. Kerr).) Manufacturers must pay the required taxes at the time their product enters the market, meaning that out-of-state manufacturers must pay taxes at the time they sell their beer to a wholesaler. (*Id.* at 17:22–18:2, 18:3–6 (Mr. Kelly).) As discussed above, the ATCC ensures tax compliance in part by conducting unannounced inspections of wholesalers to review their records of sales from manufacturers. (*Id.* at 17:16–19 (Mr. Kelly); at 125:9–15 (Dr. Kerr).) The ATCC then compares these findings to those of the Maryland Comptroller to ensure that the Comptroller has received tax payments that match the amount of product each manufacturer has shipped to a wholesaler. (*Id.* at 17:16–19 (Mr. Kelly).)

Notably, however, this system cannot apply to in-state beer manufacturers that possess direct delivery permits and out-of-state wineries that possess direct shipping permits because such permitholders sell their alcohol products directly to consumers without engaging wholesalers. Instead, Maryland ensures that these permitholders have paid taxes in two distinct ways. First, state law requires direct delivery permitholders to submit reports to the ATCC of the volume of alcohol that they brew and the number of direct deliveries they conduct, and the ATCC compares those reports to other tax records to confirm that the manufacturers have properly paid taxes. (*Id.* at 88:10–25 (Mr. Kelly).) Second, it requires out-of-state wineries to guarantee payment of taxes by posting a $1,000 bond at the time they receive their direct shipping permit. (*Id.* at 51:10–23 (Dr. Kerr).) Mr. Kelly testified that, notwithstanding the bond system for out-of-state wineries that possess direct shipping permits, the ATCC would not necessarily be aware of nonpayment of taxes by out-of-state

wineries. (*Id.* at 89:7–10 (Mr. Kelly).) Dr. Kerr confirmed during his testimony that studies have suggested that out-of-state wineries that engage in direct shipping to other states sometimes do not pay required taxes. (*Id.* at 135:2–16, 137:10–138:24, 139:17–140:16 (Dr. Kerr) (explaining one study that found that, after enactment of laws allowing direct shipping by out-of-state wineries, tax avoidance increased from two percent of wine to about eleven percent of wine shipped from out of state)); DE99. Dr. Kerr testified that the same tax avoidance patterns and concerns present in the interstate shipment of wine likely apply to the interstate shipment of beer. (ECF No. 106 at 141:1–10 (Dr. Kerr).)

Although Mr. Kelly testified that it would be logistically difficult for the ATCC to track tax payments by out-of-state breweries based on their production of alcohol by volume, (ECF No. 106 at 88:10–89:6 (Mr. Kelly)), he conceded that it likely could apply to out-of-state breweries the same bond system used to track out-of-state wineries' tax payments, (*id.* at 75:6–11 (Mr. Kelly)). He explained, however, that tracking out-of-state beer manufacturers' tax payments under either system—by volume or by bond—would create significantly more work for the ATCC, which has limited resources. (*Id.* at 76:22–77:9 (Mr. Kelly).) Moreover, he testified that the specific method by which the ATCC tracks tax payments constitutes a policy decision left to the General Assembly. (*Id.* at 77:3–14, 74:25–5 (Mr. Kelly).)

### iii. Defendants have not shown that direct-to-consumer beer delivery by out-of-state breweries would result in increased alcohol consumption by minors or adults.

Nor have Defendants shown that allowing out-of-state manufacturers to directly deliver their beer to Maryland consumers would increase minors' access to alcohol or increase adults' consumption of alcohol. Underage and pathological drinkers tend to prefer beer or

spirits more than wine, and underage drinkers specifically prefer beer over wine. DE05 at iii, 20–24;[9] (ECF No. 106 at 85:25–87:18 (Mr. Kelly), at 134:7–13 (the Court)); DE32 ¶ 71. Dr. Kerr testified that studies suggest that common carriers conduct age verification less reliably than brick-and-mortar retailers, but he identified no studies showing that the risk of improper age verification is higher where a product originates in another state. (ECF No. 106 at 126:21–132:8, 150:21–24d (Dr. Kerr)); *see also* DE76 (Oregon study)); DE87 (Vermont study); DE32 ¶¶ 13.vi, 37, 53. Relatedly, Dr. Kerr testified that there is no research to his knowledge that shows that, as compared to other forms of sale, direct shipping or delivery results in increased access to alcohol by underage drinkers. (ECF No. 106 at 150:25–151:6 (Dr. Kerr).) Mr. Kelly testified that he was aware of only one incident of direct delivery of alcohol to a minor. (*Id.* at 78:2–14 (Mr. Kelly).)

As noted above, between 2021 and 2024, Maryland authorized in-state breweries to ship beer directly to consumers using common carriers. (*Id.* at 78:2–5 (Mr. Kelly).) During this period, beer was shipped to a minor in only one instance and no unsafe or contaminated beer was shipped to a consumer by a common carrier. (*Id.* at 78:6–11 (Mr. Kelly).) Maryland regulators did not collect data regarding whether the State's authorization of direct-to-consumer beer shipping by in-state breweries between 2021 and 2024 caused any increase in beer consumption. (*Id.* at 78:12–14 (Mr. Kelly).) Nevertheless, Mr. Kelly expressed concern

---

[9] Defense Exhibit 5 is a report that the Maryland Generally Assembly commissioned from the State Comptroller in 2010 regarding "the viability and efficacy of instituting, in Maryland, the policy of permitting direct shipment of wine to consumers in the State." DE06 at 1, 12, 13. Mr. Kelly worked at the State Comptroller during this period and supervised the drafting of the report. (ECF No. 106 at 37:11–23 (Mr. Kelly).) After receiving this report, the General Assembly enacted a law that allows out-of-state wineries to ship their wine directly to Maryland consumers. DE06.

that authorizing delivery of beer by common carriers would make beer more accessible to underage consumers.  (*Id.* at 26:25–27:3 (Mr. Kelly).)

Moreover, it is not clear from the record that allowing direct delivery of beer by out-of-state manufacturers would increase beer consumption in Maryland.  Dr. Kerr testified that permitting such direct delivery would increase the supply of beer in Maryland such that, under basic economic concepts of supply and demand, the price of beer would drop, beer would become more accessible, and consumption of beer could increase.  (ECF No. 106 at 126:2–20, 141:11–20, 142:18–145:2, 147:15–148:10 (Dr. Kerr)); DE 32 at ¶¶ 13.viii, 51, 53 54, 55, 69.  Additionally, Dr. Kerr explained that out-of-state beer manufacturers may more easily evade taxes, which would allow them to sell their products to Maryland consumers at lower prices.  DE32 ¶¶ 13.vii, 13.viii, 23, 49, 50, 56, 57, 59.  At least one study shows that alcohol consumption increases when the price of alcohol decreases, (ECF No. 106 at 147:2–13, 182:1–25 (Dr. Kerr)); DE55, and at least one other study showed that home delivery resulted in greater consumption during the COVID-19 Pandemic, DE46.  Finally, Dr. Kerr explained that increased alcohol consumption can lead to greater instances of alcohol-related diseases, driving- and alcohol-related mortality, domestic violence, child abuse, suicide, homicide, and sexually risky behavior.  (ECF No. 106 at 148:11–19 (Dr. Kerr)); DE32 ¶¶ 13.viii, 51, 63, 73.

### iv. Defendants have not established that direct delivery of beer from out-of-state manufacturers raises an increased risk of delivery of unsafe beer.

Plaintiffs presented testimony from qualified food-safety expert, Mr. Kuhr, that beer is not susceptible to biological, chemical, or mechanical contamination and he knows of few such incidents of contamination.  (ECF No. 105 at 143:1–145:25, 160:17 (Mr. Kuhr).)

Biological contamination refers to contamination by pathogens, chemical contamination refers to contamination by chemical compounds or allergens, and mechanical contamination refers to contamination by physical objects that could enter the product during the manufacturing process, including during bottling or canning. (*Id.* at 143:13–15; 145:4–11, 145:21–25 (Mr. Kuhr).) Mr. Kuhr explained that beer manufacturing in the United States is regulated at the federal, state, and local level, and the federal government requires manufacturers to observe Good Manufacturing Practices, as defined by the Food and Drug Administration ("FDA"). (*Id.* at 161:11–21 (Mr. Kuhr).) Defendants' expert Dr. Kerr further testified that beer presents fewer public health risks than other forms of alcohol with higher alcohol by volume content. (ECF No. 106 at 155:15–24, 156:4–8 (Dr. Kerr).)

As to biological contamination, Mr. Kuhr testified that there are no known pathogens that can grow in beer, meaning that quality-related concerns as to beer reflect concerns as to taste rather than concerns as to harm to the consumer. (ECF No. 105 at 144:13–145:1 (Mr. Kuhr).) As to chemical contamination, he acknowledged that no food product is risk-free, and failure to follow Good Manufacturing Practices or analogous good brewing practices—as defined by the Master Brewers Association—can result in contamination of beer products by chemical compounds or allergens. (*Id.* at 145:4–11, 154:11–19 (Mr. Kuhr).) He testified, however, that in his forty-one years of experience, the risk of chemical contamination of beer during manufacturing, including during bottling or canning, is "very low." (*Id.* at 145:16–20 (Mr. Kuhr)).

Finally, Mr. Kuhr testified that mechanical contamination occurs most frequently in beer manufacturing, but it remains rare. (*Id.* at 146:2–4 (Mr. Kuhr).) He could only recall a

25

couple of times in which mechanical contamination had occurred in the previous five or ten years, and one of those instances involved Samuel Adams. (*Id.* at 146:2–10 (Mr. Kuhr).) Mr. Kuhr testified that there are "no beer finished product recalls." (*Id.* at 160:17 (Mr. Kuhr)). Mr. Kuhr acknowledged, however, that it is possible that manufacturing contamination is more likely at small breweries as compared to large breweries. (*Id.* at 172:17–173:1 (Mr. Kuhr).) Mr. Kuhr also testified that requirements that make it easier for regulators to identify, trace, and remove unsafe products from the market facilitate product safety and diminish the risk of contamination. (*Id.* at 172:1–9 (Mr. Kuhr).) Crucially, however, he testified that visual inspections cannot reveal biological, chemical, or mechanical contamination of beer. (*Id.* at 150:18–23 (Mr. Kuhr).) Rather, discovery of biological and mechanical contamination requires specialized equipment that can test specific beer samples, while discovery of chemical contamination typically requires laboratory analysis of the product. (*Id.* at 150:25–152:9 (Mr. Kuhr).)

> **v.  State regulators are concerned that it would be more difficult for the ATCC to trace products sold directly from out-of-state manufacturers to consumers.**

According to defense witnesses, direct delivery by out-of-state beer manufacturers raises significant concerns as to Maryland regulators' ability to trace products shipped directly to consumers. (ECF No. 105 at 37:7–17 (Ms. Durbin); ECF No. 106 at 26:20–24, 45:3–11, 74:19–24 (Mr. Kelly).) First, at the manufacturer tier, defense witnesses testified that the ATCC lacks the legal authority and practical resources to inspect the cleanliness, sanitation, recordkeeping, labeling practices, and storage capacity of out-of-state beer manufacturers. (ECF No. 106 at 89:19–23, 26:14–19 (Mr. Kelly); ECF No. 105 at 32:3–6 (Ms. Durbin).) Mr.

Kelly explained that the ATCC's inability to ensure compliance with Maryland's conspicuous labeling requirements for higher alcohol by volume ("ABV") drinks raises the risk that consumers may not be aware that they are ingesting a beverage with higher-than-typical alcohol content. (ECF No. 106 at 25:15–26:13, 74:17–19 (Mr. Kelly); DE32 ¶¶ 13.iv, 29, 32. For example, craft breweries tend to brew higher ABV beers, and Varietal and Vortex both sell beers that would be considered high ABV as compared to a typical beer. (ECF No. 106 at 23:17–25:7 (Mr. Kelly); ECF No. 105 at 176:15–177:7 (Mr. Kuhr) (discussing typical ABV of beer and craft breweries)); DE25–29.

Mr. Kelly testified that the State of Maryland has different inspection requirements than other states. (ECF No. 106 at 42:17–43:9 (Mr. Kelly).) He noted that the ATCC inspects beer manufacturers every year, but according to testimony by Mr. Foard, an owner of Varietal Brewing Company, the State of Washington has not inspected Varietal since it opened in 2018. (ECF No. 105 at 185:15–19 (Mr. Kelly), at 87:15–23, 89:19–21 (Mr. Baum); ECF No. 106 at 42:23–43:21 (Mr. Kelly).) Mr. Kelly also cited as an example of less frequent inspections that Pennsylvania cited Vortex in September 2025 for failure to maintain "complete and truthful malt or brewed beverage dispensing system cleaning records" since 2021. (ECF No. 105 at 76:21–77:2 (Mr. Baum) (discussing citation); DE30 (Adjudication of Pennsylvania State Police Bureau of Liquor Control Enforcement); DE31 (Vortex Citation); ECF No. 106 at 43:4–12 (Mr. Kelly) (discussing citation).) Mr. Kelly noted, however, that such citations could prevent Vortex from receiving approval for a Maryland beer delivery permit if such permit were authorized by law. (ECF No. 106 at 44:21–45:2 (Mr. Kelly).)

27

Finally, because the ATCC's leverage to enforce compliance with Maryland law stems largely from its authority to suspend or revoke licenses and permits in a manner that precludes an entity's participation in the alcohol market, Mr. Kelly expressed concern that ATCC would face diminished ability to sanction violations by out-of-state beer manufacturers. (*Id.* at 41:17–42:16, 90:2–4 (Mr. Kelly).) Specifically, he noted that the ATCC would have authority only to suspend or revoke an out-of-state beer manufacturer's direct delivery permit, which would affect only a small portion of that manufacturer's sales without inhibiting its ability to sell alcohol more broadly in its own state. (*Id.* at 41:17–42:16, 90:2–4 (Mr. Kelly); ECF No. 105 at 185:7–9 (Mr. Kuhr), at 42:14–20 (Ms. Durbin)); DE 32 ¶¶ 35, 36.

> ### vi. There is no evidence that direct-to-consumer wine shipment has resulted in increased consumption, caused other public health or safety difficulties, or inhibited Maryland's interest in tax collection.

After Maryland created the direct wine shipping permit in 2011, it issued approximately 629 direct wine shipper permits in 2012. (ECF No. 106 at 64:3–14 (Mr. Kelly)); PE13; PE37. There is no evidence that unsafe or contaminated wine has been shipped to consumers. (ECF No. 106 at 66:6–9 (Mr. Kelly).) After implementing the direct wine shipping permit, the State saw increased revenue from permit fees, alcohol excise taxes, and sales and use taxes. PE13 at 4. According to a report completed the year after implementation of the permit, "there [were] no incidents of access to underage persons reported to the Office of the Comptroller," PE13 at 8, and Mr. Kelly testified that there have been only a few instances of direct wine shipping permitholders violating the shipping requirements, (ECF No. 106 at 47:18–48:1 (Mr. Kelly).) He noted that violations typically have to do with the common carrier itself rather than the permitholder. (*Id.* at 47:24–25 (Mr. Kelly).) Although Defendants presented general

studies demonstrating that direct-to-consumer wine shipment has increased tax evasion by wineries, no party presented evidence that Maryland has lost tax revenues because of its direct wine shipping permit. (*Id.* at 135:2–16, 137:10–138:24, 139:17–140:16 (Dr. Kerr) (explaining one study that found that, after enactment of laws allowing direct shipping by out-of-state wineries, about eleven percent of wine shipped from out of state avoids taxes, which represented an increase in tax avoidance)); DE99.

## IV.    Conclusions of Law

### A. Standing

As a preliminary matter, and as explained in this Court's prior Memorandum Opinion addressing the parties' cross-motions for summary judgment, Plaintiffs have Article III standing. Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. CONST. art. III, § 2; *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). The "irreducible constitutional minimum" of Article III standing requires a plaintiff to "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc., v. Robins*, 578 U.S. 330, 338 (2016). In cases involving multiple plaintiffs seeking identical relief, "the Supreme Court has made it clear that 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (quoting *Rumsfeld v. F. for Acad. & Inst'l Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)). In this case, Plaintiffs have standing as to both Counts.

To demonstrate an injury in fact, a plaintiff must show "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent[.]" *Lujan*, 504 U.S. at 560–61 (internal citations omitted).  Where a plaintiff seeks declaratory and injunctive relief, he "must establish an *ongoing or future* injury in fact," and "may not rely on prior harms." *Overbey v. Mayor of Balt.*, 930 F.3d 215, 230 (4th Cir. 2019) (emphasis in original) (first quoting *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018); and then quoting *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018)).  Discrimination against interstate commerce forms a constitutionally cognizable injury both to the class of producers subject to the discrimination *and* to the consumers who seek to access that class of producers.  *See Freeman v. Corzine*, 629 F.3d 146, 154 (3d Cir. 2010) (holding in-state consumers' inability to "drink [wines that] are not carried by [in-state] resellers" constituted Article III injury (quoting *Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848, 849 (7th Cir. 2000)); *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 286 (1997) ("[C]ognizable injury from unconstitutional discrimination against interstate commerce does not stop at members of the class against whom a State ultimately discriminates, and customers of that class may also be injured . . . .").  A state discriminates against interstate commerce both by directly preventing out-of-state producers from accessing an in-state market and by burdening access to that market.  *See, e.g.*, *Granholm v. Heald*, 544 U.S. 460 (2005).  Thus, Plaintiffs have raised cognizable injuries under both Counts by asserting that Maryland's prohibition of direct delivery by out-of-state beer producers and requirement that any such delivery occur via a manufacturer's employees explicitly and implicitly prevent them from participating equally in Maryland's direct-beer-delivery market.  *See* (ECF No. 105 at 59:7–11 (Stipulation Four), at 62:11–16, 64:19–65:7, 65:13–21 (Mr. Furlong)); *Tracy*, 519 U.S. at 286.

30

Similarly, Plaintiffs have demonstrated that their injuries are both "fairly . . . trace[able] to the challenged action of the defendant" and likely to be redressed by the requested declaratory and injunctive relief. *Lujan*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)). Plaintiffs' injuries are directly traceable to the challenged Direct Delivery Law because it is undisputed that Mr. Furlong, Vortex, and Varietal would participate in direct delivery of beer absent the challenged statutes. *See* (ECF No. 105 at 59:7–11 (Stipulation Four)). Moreover, as Judge Hurson of this Court recently explained, "[d]eclaratory and injunctive relief are appropriate to redress ongoing or future harm." *Jensen v. Md. Cannabis Admin.*, 719 F. Supp. 3d 466, 476 (D. Md. 2024) *aff'd* 151 F.4th 169 (4th Cir. 2025). In this case, Plaintiffs seek declaratory and injunctive relief that would redress their injuries by declaring unconstitutional and enjoining enforcement of the challenged statutes. *See, e.g., Beskind v. Easley*, 197 F. Supp. 2d 464, 476 (W.D.N.C. 2002) *vacated in part on other grounds* 325 F.3d 506 (4th Cir. 2003) (granting declaratory and injunctive relief against state in challenge to its liquor laws under Commerce Clause). Accordingly, Plaintiffs have established Article III standing, and the Court addresses their substantive claims.

**B. Legal Standard**

This case implicates the balance between two distinct constitutional provisions: (1) the Commerce Clause, U.S. CONST. art. I § 8, cl. 3, which limits states' regulatory authority, and (2) the Twenty-First Amendment, U.S. CONST. amend. XXI § 2, which expands states' authority. The Commerce Clause affords Congress the authority "to regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes." U.S. CONST. art. I, § 8, cl. 3. Under the dormant Commerce Clause doctrine, the Supreme Court has long

interpreted the Commerce Clause to contain an implied nondiscrimination principle that "prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirit Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019). The dormant Commerce Clause doctrine acts "as the primary safeguard against state protectionism" by prohibiting state regulations that benefit in-state economic interests at the expense of out-of-state economic interests. *Id.* at 517; *see also Granholm*, 544 U.S. at 472 (explaining economically discriminatory laws violate the Commerce Clause "in all but the narrowest circumstances"). Prohibited differential treatment includes both facially discriminatory laws and "facially neutral laws that place[] an impermissible burden on interstate commerce." *Tenn. Wine*, 588 U.S. at 523 (quoting *Granholm*, 544 U.S. at 477). Ordinarily, the dormant Commerce Clause doctrine demands that states justify discriminatory laws under strict scrutiny. *Id.* at 518 (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008)).

Seemingly in tension with the Commerce Clause's implicit restriction of states' authority to regulate interstate commerce, however, the Twenty-First Amendment broadly authorizes states to regulate alcohol within their borders. Specifically, under Section Two of the Twenty-First Amendment, "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. CONST. amend. XXI § 2. Although this language expands states' authority to regulate alcohol, the Supreme Court has cautioned that "the aim of § 2 was not to give States a free hand to restrict the importation of alcohol for purely protectionist purposes." *Tenn. Wine*, 588 U.S at 531. Rather, Section Two "allows each State leeway to enact the measures that its citizens believe are appropriate to address the

public health and safety effects of alcohol use and to serve other legitimate interests, but it does not license the States to adopt protectionist measures with no demonstrable connection to those interests." *Id.* at 538. Accordingly, where a state law regulates alcohol, the Supreme Court has slightly relaxed the ordinary, strict-scrutiny analysis under the Commerce Clause in deference to states' regulatory authority under the Twenty-First Amendment. *See B-21 Wines, Inc. v. Bauer*, 36 F.4th 214, 221, 222 (4th Cir. 2022) *cert. denied* 143 S. Ct. 567 (2023) (citing *Tenn. Wine*, 588 U.S. at 539).

To evaluate the constitutionality of alcohol regulations, courts balance the Commerce Clause and Section Two of the Twenty First Amendment by asking "whether the principles underlying the Twenty-First Amendment are sufficiently implicated by the [discriminatory regulation] . . . to outweigh the Commerce Clause principles that would otherwise be offended." *Tenn. Wine*, 588 U.S. at 532 (quoting *Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 275 (1984)). This balancing test mandates a two-step inquiry. First, the reviewing court must determine "whether the challenged regime discriminates against interstate commerce." *B-21 Wines*, 36 F.4th at 222 (citing *Tenn. Wine*, 588 U.S. at 539). At this step, Plaintiffs bear the burden to prove that the challenged law is discriminatory. *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979). Second, if the court concludes that a regime is discriminatory, it must evaluate "whether the challenged [regime] can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *B-21 Wines*, 36 F.4th at 222 (quoting *Tenn. Wine*, 588 U.S. at 539).

Within this second step, the State must justify a discriminatory regime by either of two methods: (1) it may establish that the challenged statute is "an essential feature" of its alcohol

33

regulation system, or (2) it may prove that the discriminatory statute "actually promotes public health and safety" or another legitimate, nonprotectionist interest. *Tenn. Wine*, 588 U.S. at 535, 540; *B-21 Wines*, 36 F.4th at 227–229; *see also Granholm*, 544 U.S. at 492–93 (placing on State the burden to justify a discriminatory regime). Importantly, however, although the State must justify its discriminatory law under either method, it need not present "concrete evidence" where it can show that the challenged statute is essential to its alcohol regulation system. *B-21 Wines*, 36 F.4th at 227 n.8 (citing *Tenn. Wine*, 588 U.S. at 540). This lesser evidentiary burden reflects the consensus that a three-tier system inherently constitutes a legitimate, nonprotectionist interest. *See Granholm*, 544 U.S. at 489 (quoting *North Dakota v. United States*, 495 U.S. 423, 432 (1990)); *B-21 Wines*, 36 F.4th at 227 (citing *Tenn. Wine*, 588 U.S. at 534–35). Accordingly, the State need only present "concrete evidence" to justify a discriminatory law if that law is *not* essential to its three-tier system of alcohol regulation. *B-21 Wines*, 36 F.4th at 227 n.8 (citing *Tenn. Wine*, 588 U.S. at 540). The Court reviews the specific statues challenged in this case before applying this constitutional framework.

### C. Challenged Laws: Direct-to-Consumer Beer Delivery Permits

#### i. Maryland operates a three-tier system of alcohol regulation.

As discussed above, Maryland operates a three-tier system to regulate alcoholic beverages under which it divides its alcohol market into (1) producers or manufacturers; (2) wholesalers; and (3) retailers.[10] By state law, the State of Maryland licenses producers and wholesalers, while local jurisdictions and counties license retailers. *See* MD. CODE ANN., ALC.

---

[10] State law defines "alcoholic beverages" to include "alcohol, brandy, whiskey, rum, gin, cordial, beer, and wine," MD. CODE ANN., ALC. BEVS. & CANNABIS § 1-101(b)(1), and "beer" to mean "a brewed alcoholic beverage," including ale, porter, stout, certain hard ciders, and mead, *id.* § 1-101(c)(1), (2).

BEVS. & CANNABIS § 3-101 (requiring applications for manufacturers and wholesalers licenses to be filed with ATCC); *id.* §§ 2-301 *et seq.* (providing wholesalers licenses); *id.* §§ 2-201 *et seq.* (providing manufacturers licenses); *id.* §§ 4-201–4-214 (discussing local licenses); *id.* §§ 9-101– 33-2802 (codifying local licenses by jurisdiction or county). Specifically, the Maryland Alcohol, Tobacco, and Cannabis Commission ("ATCC") licenses, permits, inspects, and enforces laws applicable to producers and wholesalers. *See, e.g., id.* §§ 1-307, 2-102, 2-201, 2-301. Under state law, "licenses" are issued only to in-state producers and wholesalers, meaning that a beer manufacturer must be an in-state resident to obtain a manufacturer's license. *See id.* § 2-211 (residency requirement for manufacturer's license); *see also id.* § 3-106(a)(2) (imposing residency requirement for limited liability companies seeking licenses); *id.* § 3-105(b)(2) (imposing residency requirements for corporations or clubs seeking licenses); *id.* § 3-104(b)(2) (imposing residency requirements for partnerships seeking licenses); *id.* § 3-102 (imposing residency requirement for individual applicant seeking license). Unlike licenses, however, the ATCC issues "permits" to both in- and out-of-state producers. *See, e.g., id.* § 2-144 (imposing no residency requirement for direct wine shipping permit).

Within this system, a wholesaler may not have an interest in a retailer or otherwise enter restrictive or impermissible agreements with retailers regarding product distribution. *See id.* § 2-315 (prohibiting financial interest); § 2-317 (prohibiting restrictive agreements); § 2-316 (codifying prohibited practices). Similarly, wholesalers are statutorily prohibited to sell or deliver alcoholic beverages to an unlicensed or un-permitted person or entity. *Id.* § 2-313. Relatedly, manufacturers may not sell or deliver alcohol to an unlicensed or unpermitted person or entity except where such manufacturer possesses a permit to delivery beer directly

to consumers. *Id.* § 2-214. Notwithstanding its general three-tier system, Maryland authorizes a limited exception to this system under which eligible, licensed beer manufacturers may obtain a direct-to-consumer beer delivery permit.

### ii. Direct-to-Consumer Beer Delivery

In 2020, then-Maryland Governor Lawrence J. Hogan, Jr. ("Governor Hogan"), issued executive orders authorizing alcohol manufacturers licensed in Maryland to ship alcohol directly to consumers in Maryland. (ECF No. 53 at 3.) In 2021, the Maryland General Assembly enacted the Direct Shipping Act of 2021, Md. Laws ch. 359 (SB821), MD. CODE ANN., ALC. BEVS. & CANNABIS § 2-219 (2021) (repealed July 1, 2024), which codified portions of Governor Hogan's executive orders. (ECF No. 53 at 4.) This 2021 version of the Direct Shipping Act created a direct shipping permit that allowed in-state breweries to ship their beer to in-state consumers using common carriers and included a one-year sunset provision such that, absent legislative intervention, it would expire on December 21, 2022. (*Id.*) The General Assembly twice extended that expiration date before repealing the Act on July 1, 2024. (*Id.*)

In 2024, the General Assembly enacted the statutes at issue in this case by passing Senate Bill 1041 ("SB 1041"), 2024 Md. Laws Ch. 918, or the Direct Shipping Act of 2024, ("Direct Delivery Law") which became effective on July 1, 2024. *See generally* MD. CODE ANN., ALC. BEVS. & CANNABIS §§ 2-167–2-175 (Direct-to-Consumer Beer and Liquor Delivery).[11]

---

[11] Due to the complex nature of alcohol regulations, Senate Bill 1041 was enacted into law by amending or modifying numerous provisions of Maryland's Alcoholic Beverages and Cannabis Article. Additionally, it conditions eligibility for a direct delivery permit on eligibility for manufacturers licenses, which are codified in separate portions of the Alcoholic Beverages Code. *See* MD. CODE ANN., ALC. BEVS. & CANNABIS §§ 2-208 (Class 6 Pub-Brewery License); § 2-209 (Class 7 Micro-Brewery License); § 2-210 (Class 8 Farm Brewery License); § 2-211 (residency requirement for manufacturer's licenses); § 2-308 (Class 7 Limited Beer Wholesaler's License). For clarity and consistency, this Court refers to the laws enacted as part of Senate Bill 1041 and challenged in this action as the "Direct Delivery Law."

According to its preamble, the Direct Delivery Law sought to "reaffirm[] the legitimacy of the three-tiered system as a means of regulating the alcoholic beverages industry" and "to limit the issuance of direct delivery permits . . . to licensed Maryland manufacturers in order to promote public health and provide strong incentives not to sell alcohol in a way that threatens public health or safety . . . ." SB 1041, 2024 Md. Laws ch. 918; PE17. Plaintiffs challenge the Direct Delivery Law as unconstitutional.[12]

The Direct Delivery Law, codified in relevant part at Sections 2-168(a) and 2-169 of the Alcoholic Beverages Article, prohibits out-of-state beer manufacturers from delivering beer directly to Maryland consumers but allows in-state manufacturers to provide such delivery. First, it imposes a permit requirement under which a beer producer may only "deliver[] beer directly to a consumer in the State" if it has "be[en] issued a direct beer delivery permit." MD. CODE ANN., ALC. BEVS. & CANNABIS § 2-168(a); *see id.* § 2-214 (prohibiting licensed manufacturers who do not hold direct delivery permits to deliver beer directly to consumers). Second, the Direct Delivery Law conditions eligibility for a direct delivery permit on licensure as a manufacturer *and* a Class 7 limited beer wholesaler, both of which require Maryland residency. *Id.* § 2-169(a)(1); *see also id.* § 2-170(a)(2) (requiring proof of manufacturer's license to obtain direct delivery permit); *id.* §§ 2-167–2-175 (governing direct-

---

[12] In the Prayer for Relief of their Amended Complaint (ECF No. 35) and Proposed Conclusions of Law (ECF No. 109), Plaintiffs include a request that the residency requirement to obtain a manufacturer's license, codified at MD. CODE ANN., ALC. BEVS. & CANNABIS §§ 2-211, 3-102, 3-105(b), be declared unconstitutional. (ECF No. 35 at 9; ECF No. 109 at 23.) At trial and throughout this litigation, Plaintiffs presented no evidence or argument that this residency requirement itself—as distinct from the provision of the Direct Delivery Law that conditions direct delivery permits on receipt of a manufacturer's license—is unconstitutional. Rather, they focused their evidence and argument on the provisions of the Direct Delivery Law and the narrower inquiry of whether the residency requirement *for the direct delivery permits authorized therein* is unconstitutional. Accordingly, Plaintiffs have not met their burden to demonstrate that the broader residency requirement for beer manufacturer licenses in Maryland is unconstitutionally discriminatory, and this Court's inquiry as to the constitutionality of Sections 2-211, 3-102, and 3-105(b) of the Alcoholic Beverages Article ends here.

to-consumer beer and liquor delivery); *id.* § 2-211 (imposing residency requirement for manufacturer license).   Thus, a beer producer may only obtain a direct beer delivery permit if that producer also meets the requirements to obtain (1) a manufacturer's license; and (2) a Class 7 beer wholesaler license.  Significantly, a brewery must hold a manufacturer's license to obtain a Class 7 beer wholesaler license.  *See id.* § 2-308(b) (conditioning Class 7 limited beer wholesaler's license on beer manufacturer licensure).

Under Section 2-211 of the Alcoholic Beverages Article, Maryland imposes explicit residency requirements on breweries seeking manufacturer's licenses:

> To be issued a manufacturer's license, the following individuals shall reside in
> the State at the time of filing an application for the license:
> (1) for a sole proprietorship, the individual applicant;
> (2) for a corporation or limited liability company, the individual who
> qualifies as a resident applicant; or
> (3) for a partnership, each partner of the applicant.

*Id.*; *see also id.* § 3-102 ("To be issued a manufacturer's license or a wholesaler's license, an individual applicant shall be a resident of the State at the time the application is filed."); *id.* § 3-105(b) (imposing requirement for "license on behalf of a corporation or club" that at least one club officer must "be a resident of the State at the time the application is filed; and . . . remain a resident of the State for the duration of time the license is in effect.").  Moreover, Maryland prohibits out-of-state beer producers from directly shipping or delivering beer to consumers in Maryland:

> (a)(1) A person in the business of selling or distributing alcoholic beverages in
> or from another state may not ship, cause to be shipped, or deliver
> alcoholic beverages directly to a recipient in the State if the seller,
> distributor, shipper, transporter, or recipient does not hold the required
> license or permit.
> (2) The prohibition under paragraph (1) of this subsection applies to
> alcoholic beverages ordered or purchased through a computer network.

(b) A person who violates this section is guilty of a felony and on conviction is subject to imprisonment not exceeding 2 years or a fine not exceeding $1,000 or both.

*Id.* § 6-327.

Finally, a beer producer who has obtained a direct-beer-delivery permit may only directly deliver beer via its own employees who have completed required alcohol awareness training. *See id.* § 2-169(a)(2)(i) ("The holder of a direct beer delivery permit issued under § 2-170 of this subtitle may sell and deliver the permit holder's own product to an individual in the State if: (i) the delivery is made by an employee who is . . . at least 18 years old; and . . . certified by an approved alcohol awareness program[.]"). That is, beer producers cannot legally use common carriers to deliver beer directly to consumers in Maryland. *Id.*

### D. Constitutional Analysis Step One: The Direct Delivery Law facially and implicitly discriminates against out-of-state economic interests.

Under the first step of the two-step constitutional analysis applied to state alcohol regulations challenged under the dormant Commerce Clause doctrine, the plaintiff bears the burden to establish that a law discriminates against interstate commerce. *See Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979) (explaining burdens under general dormant Commerce Clause doctrine); *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 538 (2019) (holding nondiscrimination principle within dormant Commerce Clause doctrine applies to state alcohol regulations). In this case, Plaintiffs allege in Count I that the Direct Delivery Law is facially discriminatory to the extent it contains a residency requirement authorizing only in-state beer manufacturers to obtain direct delivery permits and in Count II that the Direct Delivery Law is discriminatory in effect to the extent it forbids delivery by common carrier. Plaintiffs have met their burden to establish discrimination as to both Counts.

### i. Count I: The Direct Delivery Law's residency requirement is discriminatory.

Under the dormant Commerce Clause doctrine, states cannot pass laws that facially "discriminat[e] against imported liquor" or alcohol. *Granholm v. Heald*, 544 U.S. 460, 476, 487–88 (2005) (collecting cases). "The Supreme Court has defined impermissible discrimination for purposes of the dormant Commerce Clause as 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *B-21 Wines, Inc. v. Bauer*, 36 F.4th 214, 222 (4th Cir. 2022) (quoting *Granholm*, 544 U.S. at 472). Put differently, states cannot pass laws that "burden[] only out-of-state products[,]" *Granholm*, 544 U.S. at 477 (citing *Walling v. Michigan*, 116 U.S. 446, 455 (1886)), including laws that impose "in-state presence and residency requirements," *Tenn. Wine*, 588 U.S. at 535. In this case, the Direct Delivery Law authorizes only licensed manufacturers to obtain a direct delivery permit, MD. CODE ANN., ALC. BEVS. & CANNABIS § 2-169(a)(1), and Maryland licenses solely in-state manufacturers, *id.* § 2-211. Similarly, the Direct Delivery Law prohibits direct delivery without a direct delivery permit. *Id.* § 2-168(a). All parties agree that the Direct Delivery Law's residency requirement facially discriminates against interstate commerce by precluding out-of-state producers from participating in direct delivery of beer in Maryland.[13] *See* (ECF No. 110 ¶ 61; ECF No. 105 at 100:1–102:4 (State acknowledging that it does not dispute effect on interstate commerce). Furthermore, even absent such agreement, a statute is discriminatory where it singles out out-of-state entities for exclusion while authorizing in-state entities to

---

[13] Moreover, even if the laws are not facially discriminatory, they are discriminatory in effect. The Supreme Court has held that residency requirements are discriminatory in effect because they require out-of-state producers to open up shop in-state before engaging in the state's market, which in turn increases costs for out-of-state producers as compared to in-state producers. *Granholm*, 544 U.S. at 474–75.

engage in specified conduct. *B-21 Wines*, 36 F.4th at 223. Accordingly, Plaintiffs have met their burden to establish discrimination as to Count I.

### ii. Count II: The requirement that direct delivery occur via employees and not by common carrier is discriminatory in effect.

Plaintiffs concede that the employee-delivery requirement challenged in Count II is facially neutral but argue that it discriminates in effect against out-of-state manufacturers because it is economically infeasible for most out-of-state manufacturers to directly deliver beer in this manner.[14] The Commerce Clause precludes "[s]tates from passing facially neutral laws that place[] an impermissible burden on interstate commerce." *Granholm*, 544 U.S. at 477 (collecting cases); *Tenn. Wine*, 588 U.S. at 523 (quoting *Granholm*, 544 U.S. at 477). Generally, to demonstrate that a law is discriminatory in effect, a plaintiff must show that the law, "if enforced, would negatively impact interstate commerce to a greater degree than intrastate commerce." *Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145, 153 (4th Cir. 2016) (quoting *Colon Health Ctrs. of Am., LLC v. Hazel (Colon Health I)*, 733 F.3d 535, 543 (4th Cir. 2013)). In the context of alcohol regulations specifically, the Supreme Court has suggested that a law is discriminatory where its "effect" is "to make direct sales impractical from an economic standpoint" for out-of-state producers.[15] *Granholm*, 544 U.S. at 466; *see also Cherry Hill*

---

[14] A law may also be unconstitutionally discriminatory where its object is to discriminate against out-of-state consumers. *See Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145, 155 (4th Cir. 2016) (explaining a law may discriminate "facially, in effect, or purposefully" or by incidentally burdening interstate commerce in a manner that is "clearly excessive in relation to [the law's] putative local benefits" (quoting *Sandlands C&D LLC v. Cnty. of Horry*, 737 F.3d 45, 53 (4th Cir. 2013))). Although Plaintiffs previously appeared to argue that the Direct Delivery Act was enacted with discriminatory intent, their arguments at trial largely focused on the discriminatory effects of the challenged law. *See* (ECF No. 109 at 12–13.)

[15] Notably, few cases have explicitly addressed discrimination in effect in the context of a constitutional challenge to alcohol regulations. In *Granholm*, the Supreme Court suggested that differential treatment that renders market participation economically infeasible solely for out-of-state manufacturers is discriminatory in violation of the Commerce Clause. *See* 544 U.S. at 466. This Court has identified only one case, *Chicago Wine Company v. Braun*, 148 F.4th 530 (7th Cir. 2025) (per curiam), that considered whether a ban on the use of

*Vineyards, LLC v. Lilly*, 553 F.3d 423, 433 (6th Cir. 2008) (deeming alcohol regulation discriminatory in effect where it made purchases "economically and logistically infeasible").

In this case, the requirement that direct delivery permitholders effectuate delivery via their own employees "make[s] direct sales impractical from an economic standpoint" and effectively precludes many out-of-state manufacturers from directly delivering their beer. *Granholm*, 544 U.S. at 466. The Direct Delivery Law limits the amount of beer deliverable to one address in the same year to 12 cases. MD. CODE ANN., ALC. BEVS. & CANNABIS § 2-173(b)(1). At least one Plaintiffs' witness testified to the expense of beer distribution and explained that Varietal did not produce a sufficient volume of alcohol to maintain a relationship with a wholesaler. (ECF No. 105 at 88:14-24 (Mr. Baum (Varietal)).) Additionally, the parties stipulated that Varietal would not be able to use its own employees to directly deliver beer to Maryland consumers because of its distance from Maryland. (ECF No. 105 at 59:7–11 (Stipulation Four).) Given that direct delivery is limited to 12 cases per consumer per year, the employee-delivery requirement renders such delivery economically infeasible where a manufacturer is not physically near the state of Maryland.

Moreover, even under the more traditional Commerce Clause analysis, the employee-delivery requirement "negatively impact[s]" out-of-state producers more than in-state

---

common carriers to supply alcohol to consumers is discriminatory. In a concurrence in judgment in that case, Judge Scudder applied the balancing test elucidated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), to a facially neutral common-carrier ban. Under Fourth Circuit precedent, however, *Pike* balancing applies only to laws that are neither facially discriminatory, discriminatory in purpose, nor discriminatory in effect. *See, e.g., Just Puppies, Inc. v. Brown*, 123 F.4th 652, 669 (4th Cir. 2024) (applying *Pike* balancing because the challenged law "does not discriminate against out-of-state economic interests in purpose or effect"). Applying binding precedent from the Fourth Circuit and Supreme Court, this Court concludes that Plaintiffs have met their burden to demonstrate that the employee-delivery requirement and common-carrier ban in this case discriminate in effect against out-of-state economic interests to the benefit of intra-state economic interests.

producers. *Colon Health*, 813 F.3d at 153. "The fulcrum of this inquiry [is] whether the [challenged regime] erects a special barrier to market entry by non-domestic entities." *Id.* at 153 (quoting *Colon Health I*, 733 F.3d at 546). Although nearby out-of-state producers like Vortex could likely engage in direct delivery using their own employees, participation by more distant out-of-state manufacturers would remain economically and logistically burdensome enough to preclude their participation in the direct-delivery market altogether. *See id.* (citing *Granholm*, 544 U.S. at 472); (ECF No. 105 at 59:7–11 (Stipulation Four)); *Cherry Hill Vineyards*, 553 F.3d at 433. In effect, therefore, the employee-delivery requirement discriminates by narrowing the market by excluding most out-of-state breweries to the broad benefit of in-state manufacturers, most or all of whom can likely engage in direct delivery via their own employees. Accordingly, Plaintiffs have met their burden to establish that the common carrier requirement is discriminatory in effect. *See Colon Health*, 813 F.3d at 153.

    **E. Constitutional Analysis Step 2: Defendants have not met their burden to justify the residency and employee-delivery requirements under the Twenty-First Amendment.**

Section Two of the Twenty-First Amendment does not "immunize[] discriminatory direct-shipment laws from Commerce Clause scrutiny." *Granholm v. Heald*, 544 U.S. 460, 487–88 (2005) (collecting cases); *Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263 (1984); *see Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 538 (2019) ("[Section Two] allows each State leeway to enact the measures that its citizens believe are appropriate to address the public health and safety effects of alcohol use and to serve other legitimate interests, but it does not license the States to adopt protectionist measures with no demonstrable connection to those interests."). Where, as here, a plaintiff has established that challenged alcohol regulations

economically discriminate against out-of-state interests, the burden shifts to the State to justify those regulations. *Tenn. Wine*, 588 U.S. at 539 (citing *Granholm*, 544 U.S. at 490). Specifically, the State bears the burden to prove that "the principles underlying the Twenty-First Amendment are sufficiently implicated by the [discriminatory regulation] . . . to outweigh the Commerce Clause principles that would otherwise be offended."[16] *Id.* at 532 (quoting *Bacchus Imps.*, 468 U.S. at 275).

As both the Supreme Court and the Fourth Circuit have explained, a State meets this burden where it can demonstrate that the challenged regulation serves public health and safety or another legitimate, nonprotectionist interest. *B-21 Wines*, 36 F.4th at 222 (quoting *Tenn. Wine*, 588 U.S. at 539). As explained above and further below, a law serves a legitimate, nonprotectionist ground where it is "an essential feature" of the state's three-tier system of alcohol regulation. *Id.* at 227 (citing *Tenn. Wine*, 588 U.S. at 535). Where a state can show that a law is an "essential feature" of its three-tier system, therefore, it need not present concrete evidence that the law serves public health and safety. *Id.* at 227 n.8. In this case, Defendants

---

[16] In *Granholm v. Heald*, 544 U.S. 460 (2005), the Supreme Court held that the Twenty-First Amendment does not provide states blanket authority to enact discriminatory alcohol regulation laws. *Id.* at 487–88 (collecting cases). *Granholm* addressed state laws that treated out-of-state wine producers differently than in-state wine producers and ultimately determined that such differential treatment violated the Commerce Clause notwithstanding states' authority under Section Two of the Twenty-First Amendment. *Id.* at 493. Prior to the Supreme Court's decision in *Tennessee Wine and Spirits Retailers Association v. Thomas*, 588 U.S. 504 (2019), many federal courts recognized some dispute as to whether the Court's holding in *Granholm* was limited to producers or applied more broadly to regulations of retailers and wholesalers. *See, e.g.*, *Byrd v. Tenn. Wine & Spirits Retailers Ass'n*, 883 F.3d 608, 616 (6th Cir. 2018) (collecting cases). In *Tennessee Wine*, however, the Supreme Court appeared to clarify that *Granholm* applies to regulations of any tier of the three-tier system. *See, e.g.*, *Day v. Henry*, 152 F.4th 961, 969–70 (9th Cir. 2025) (discussing *Tennessee Wine*). Although the Fourth Circuit has not since had occasion to assess the constitutionality of a law regulating alcohol *producers*, it has framed the *Tennessee Wine* decision as "enunciat[ing] . . . a two-step framework for assessing alcoholic beverage control laws that are challenged under the dormant Commerce Clause." *B-21 Wines*, 36 F.4th at 222. Accordingly, this Court applies the constitutional framework elucidated in *Tennessee Wine* and followed by the Fourth Circuit in its most recent evaluation of "alcoholic beverage control laws" like those at issue in this case. *Id.*

argue that the in-state residency requirement challenged in Count I is essential to its three-tier system and serves public health and safety. As to Count II, Defendants argue only that the employee-delivery requirement serves public health and safety. The Court addresses each Count in turn.

### i. Count I: Residency Requirement

#### 1. The Direct Delivery Law's residency requirement, as challenged in Count I, is not essential to Maryland's three-tier system of alcohol regulation.

Defendants have not met their burden to demonstrate that the Direct Delivery Law's residency requirement is essential to Maryland's three-tier alcohol regulation system. The Supreme Court has consistently emphasized "that the three-tier system itself is 'unquestionably legitimate.'" *Granholm*, 544 U.S. at 489 (quoting *North Dakota*, 495 U.S. at 432). Thus, "discriminatory requirements that are essential features of the three-tier system are authorized by the Twenty-First Amendment." *B-21 Wines*, 36 F.4th at 227 (citing *Tenn. Wine*, 588 U.S. at 534–35). Significantly, where a state asserts that a discriminatory law is "an essential feature" of its three-tier system, it need not present concrete evidence that such law "actually serves public health and safety." *Id.* at 227 n.8 (citing *Tenn. Wine*, 588 U.S. at 540). Instead, a court must consider whether a law is essential by evaluating whether (1) other states impose similar regulations; and (2) the regulation flows from the basic three-tier regulatory system itself such that it is an "integral" part of that system. *Id.* at 228 (citing *Tenn. Wine*, 588 U.S. at 535); *Tenn. Wine*, 588 U.S. at 535 (suggesting regulation is not essential because many other states lack similar regulations within their three-tier systems). Before evaluating the specific Direct

Delivery Law at issue in this case, a primer of recent caselaw addressing the extent to which an alcohol regulation is "essential" to a three-tier system proves useful.

### a.  Constitutional Jurisprudence

Federal courts almost uniformly agree that a regulation that precludes out-of-state *retailers* from directly shipping alcohol to in-state consumers is essential to a state's three-tier system because such regulation prevents the sale of alcohol that has not gone through any tier of the regulatory system. *See, e.g., B-21 Wines*, 36 F.4th at 228; *Lebamoff Enters., Inc. v. Whitmer*, 956 F.3d 863, 872 (6th Cir. 2020) (upholding against Commerce Clause challenge law that prohibited out-of-state wine retailers from shipping directly into the state because such law would eliminate the role of wholesalers and "create a sizeable hole in the three-tier system"); *Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1182 (8th Cir. 2021) (collecting cases upholding as essential to three-tier system laws that ensure alcohol passes through in-state wholesalers); *Day v. Henry*, 152 F.4th 961, 972–73, 973–74 (9th Cir. 2025) (collecting cases upholding physical premises requirement as "essential" to three-tier system of regulation and recognizing that law was essential to the extent it required alcohol to pass through state's wholesaler tier); *Jean-Paul Weg, LLC v. Dir. Of N.J. Div. of Alcohol Beverage Control*, 133 F.4th 227, 239 (3d Cir. 2025) (suggesting that law prohibiting direct delivery by out-of-state retailer is essential to preservation of three-tier system).  Specifically, such laws ensure that alcohol passes through the regulating state's wholesaler tier. *See, e.g. Sarasota Wine Mkt.*, 987 F.3d at 1181; *Whitmer*, 956 F.3d at 872.  As discussed above, the wholesaler tier acts as a buffer to prevent improper collusion between alcohol producers and alcohol retailers.  Thus, the wholesaler tier is essential to ensure separation between producers and retailers, which, in turn,

renders laws that preserve the role of the wholesale tier essential to a three-tier system. *See, e.g., Sarasota Wine Mkt.*, 987 F.3d at 1181; *Whitmer*, 956 F.3d at 872; *Day*, 152 F.4th at 974; *B-21 Wines*, 36 F.4th at 228.

As the Fourth Circuit has recognized, however, laws that regulate retailers are distinct from those that regulate producers. *See B-21 Wines*, 36 F.4th at 229 (distinguishing caselaw addressing regulation of producers from that addressing regulation of retailers). Crucially, producers are the first tier of the three-tier system, while retailers constitute the final tier. This distinction proves significant because "producers in a three-tier system often are not located in the State in which the sales occur." *Wine Country Baskets v. Steen*, 612 F.3d 809, 815 (5th Cir. 2010) (citing *Granholm*, 544 U.S. at 489); (ECF No. 105 at 48:6–10 (Ms. Durbin)). To account for sale in-state of alcohol produced out-of-state, therefore, most states structure their three-tier systems to require later tiers—and particularly the final, retailer tier—to maintain an in-state presence. *See Steen*, 612 F.3d at 815; *B-21 Wines*, 36 F.4th at 229 (distinguishing producer cases on basis that states cannot allow only in-state producers to bypass the three-tier system). Thus, courts typically uphold in-state residency requirements for retailers or wholesalers because such residency requirements are necessary to ensure that out-of-state producers' alcohol passes through the state's wholesaler tier and therefore its regulatory system more generally.

Only two cases—*Granholm v. Heald*, 544 U.S. 460 (2005) and *Beskind v. Easley*, 325 F.3d 506 (4th Cir. 2003)—have directly addressed the constitutionality of state laws that afford direct delivery or direct shipping privileges to in-state producers but not out-of-state producers. In both cases, the Supreme Court and the Fourth Circuit, respectively, held

47

unconstitutional laws that allowed in-state wine producers to ship directly to consumers but prohibited out-of-state wine producers from engaging in direct shipping. *Granholm*, 544 U.S. at 493 ("[Section] 2 of the Twenty-first Amendment . . . does not allow States to ban, or severely limit, the direct shipment of out-of-state wine while simultaneously authorizing direct shipment by in-state producers. If a State chooses to allow direct shipment of wine, it must do so on evenhanded terms."); *Beskind*, 325 F.3d at 517 ("Thus, we conclude that North Carolina's regulatory preference of in-state wine manufacturers discriminates against out-of-state wine manufacturers and sellers, in violation of the dormant Commerce Clause, and that the preference is 'not supported by any clear concern of the Twenty-first Amendment,' and therefore is not saved by the Twenty-first Amendment." (internal citations omitted)).

Although both decisions predated the Supreme Court's most recent clarification of the Twenty-First Amendment analysis in *Tennessee Wine and Spirits Retailers v. Thomas*, 588 U.S. 504 (2019), the Fourth Circuit recently reaffirmed the distinction between regulation of retailers and regulation of producers. *B-21 Wines*, 36 F.4th at 229 (applying *Tennessee Wine* framework and emphasizing consistency with *Granholm* and *Beskind*). Specifically, the Fourth Circuit clarified that laws that prohibit out-of-state retailers from shipping wine into the state are essential to ensure alcohol passes through a state's three-tier system, while laws that "allow[] only in-state wine producers to bypass the statutory three-tier system of alcohol distribution and ship directly to consumers" remain unconstitutional. *Id.* (first citing *Granholm*, 544 U.S. at 474; and then citing *Beskind*, 325 F.3d at 509). With this background in mind, the Court addresses whether the challenged residency requirement within the Direct Delivery Law is essential to Maryland's three-tier system of alcohol regulation.

### b. Application to Residency Requirement

Defendants have not met their burden to demonstrate that the residency requirement is essential to Maryland's three-tier system. As discussed above, courts evaluate whether a law is "essential" to a three-tier system by considering (1) whether the challenged restriction is a consistent part of most states' three-tier systems, and (2) whether the challenged restriction flows directly from the three-tier system itself. *B-21 Wines*, 36 F.4th at 228 (citing *Tenn. Wine*, 588 U.S. at 535). In this case, the residency requirement for direct delivery by producers is neither a common component of other states' three-tier systems nor an integral part of Maryland's three-tier regulatory system.

First, the Supreme Court has suggested that a law is unlikely to be essential to the preservation of a state's three-tier system when other states decline to impose similar restrictions. *Tenn. Wine*, 588 U.S. at 535 ("Such a requirement is not an essential feature of a three-tiered scheme. Many such schemes do not impose durational residency requirements— or indeed any residency requirements . . . ."); *B-21 Wines*, 36 F.4th at 228 (suggesting *Tennessee Wine*, including its consideration of whether challenged requirement is imposed in other states, "is highly instructive" to assessment of whether challenged law is essential to three-tier scheme). As relevant to the challenged Direct Delivery Law in this case, numerous states and the District of Columbia allow out-of-state producers to ship or deliver their products, subject to certain restrictions, directly to in-state consumers. *See* D.C. CODE § 25-772(a) (2000), D.C. Laws 13-298; NEB. REV. STAT. § 53-123.15, 2013 Neb. Laws LB 230; N.H. REV. STAT. § 178:27, 2003 NH Laws ch. 231; OH. REV. CODE § 4303.232; 2021 Oh. Laws File 30 at 1328; VT. STAT. ANN. § 277; 2017 Vt. Laws No. 83; VA. CODE ANN. § 4.1-209.1. Moreover,

Maryland already authorizes out-of-state wine producers to ship their products directly to Maryland consumers, which further suggests that the restriction of direct shipping or delivery by out-of-state manufacturers is *not* essential to its three-tier system. *See* MD. CODE ANN., ALC. BEVS. & CANNABIS §§ 2-142–2-156; (ECF No. 106 at 62:4–63:18, 64:12–18, 66:16–70:25, 72:15–21 (Mr. Kelly)).

Second, the Direct Delivery Law's residency requirement does not flow from Maryland's basic three-tier regulatory system itself. *B-21 Wines*, 36 F.4th at 228 (citing *Tenn. Wine*, 588 U.S. at 535). At trial, Plaintiffs adduced evidence that beer manufacturers located outside of Maryland routinely provide their beer to consumers in the state. *See, e.g.,* (ECF No. 105 at 48:6–10 (Ms. Durbin); ECF No. 106 at 17:22–18:2 (Mr. Kelly) (discussing payment of taxes by out-of-state producers)). Thus, Maryland's three-tier system does not require producers to manufacture their beer within the state to sell it within Maryland.[17] Nor is the residency requirement for direct delivery essential to preserving the wholesale tier of Maryland's three-tier system. *See, e.g., Sarasota Wine Mkt.*, 987 F.3d at 1181 (emphasizing importance of maintaining wholesaler tier); *accord Whitmer*, 956 F.3d at 872; *Day*, 152 F.4th at 974; *see also B-21 Wines*, 36 F.4th at 228 (framing regulation as essential to the extent it prevented out-of-state retailers from selling alcohol that bypassed state's three-tier system entirely). Maryland already authorizes out-of-state beer manufacturers to evade the wholesale tier by selling their products directly to retailers. (ECF No. 105 at 73:8–10, 82:11–16, 83:1–3 (Mr. Foard)); MD. CODE ANN., ALC. BEVS. & CANNABIS § 2-132 (c)(1) (establishing

---

[17] As explained above, this distinction differentiates this case from those involving retailers, because many states ensure that alcohol passes through their three-tier system by requiring retailers to maintain a physical presence within the state. The same is not true for producers.

nonresident brewery permit that "authorizes the permit holder to sell and deliver not more than 3,000 barrels of the permit holder's own beer annually from a location outside the State to a retail license holder or permit holder in the State authorized to acquire the beer"). Thus, unlike in retailer cases, where direct shipment by a retailer threatens to topple the three-tier system by wholly bypassing the wholesaler tier, the direct delivery permit does not implicate the wholesaler tier and, even if it did, Maryland has already authorized out-of-state producers to bypass that tier.

Finally, the residency requirement cannot be essential to preservation of the three-tier system of alcohol regulation because the direct delivery permit itself "allow[s] only in-state [beer] producers to bypass the statutory three-tier system of alcohol distribution and ship directly to consumers." *B-21 Wines*, 36 F.4th at 229 (first citing *Granholm*, 544 U.S. at 474; and then citing *Beskind*, 325 F.3d at 509). A law that authorizes in-state manufacturers to bypass the three-tier system cannot be essential to that system, the purpose of which is to "funnel sales through the three-tier system." *Granholm*, 544 U.S. at 489. In the retailer cases discussed above, in-state retailers did not bypass the relevant three-tier system by shipping products directly to consumers because, as the final tier in the system, in-state retailers shipped products that had already passed through the system. *See, e.g., B-21 Wines*, 36 F.4th at 229 (framing regulation of retailers as requiring out-of-state retailers to sell wine via state's three-tier system). In this case, however, Maryland authorizes in-state but not out-of-state beer producers to bypass its three-tier system by delivering and selling products directly to consumers. "The fact that [Maryland] finds it unnecessary for its Twenty-first Amendment purposes to require in-state [beer] manufacturers to sell and distribute through a system as tightly regulating as the

three-tiered system suggests that it should also find it unnecessary to require out-of-state sources to sell and distribute through the three-tiered system." *Beskind*, 325 F.3d at 516–17. Accordingly, the Direct Delivery Law is not essential to the preservation of Maryland's three-tier system.

> ### 2. Defendants have not met their burden to present concrete evidence that the residency requirement actually serves public health and safety.

Where, as here, a challenged regulation is not essential to a three-tier system, the State bears the burden to present "concrete evidence" that the challenged regulation "actually promotes public health or safety." *Tenn. Wine*, 588 U.S. at 540 (citing *Granholm*, 544 U.S. at 490); *B-21 Wines*, 36 F.4th at 227 n.8 (citing *Tenn. Wine*, 588 U.S. at 533–34); *Granholm*, 544 U.S. at 490, 492. Additionally, the State must demonstrate that "nondiscriminatory alternatives would be insufficient to further" the public health and safety interests served by the challenged regulations. *Tenn. Wine*, 588 U.S. at 540 (citing *Granholm*, 544 U.S. at 490); *Granholm*, 544 U.S. at 492–93 ("The Court has upheld state regulations that discriminate against interstate commerce only after finding, based on concrete record evidence, that a State's nondiscriminatory alternatives will prove unworkable."). As explained further below, Defendants have not met this burden as to the residency requirement challenged in Count I.

> ### a. Defendants have not shown that the residency requirement actually serves public health and safety or other legitimate nonprotectionist interests.

At trial, Defendants presented witness testimony and evidence that the Direct Delivery Law's residency requirement serves nonprotectionist interests and public health and safety by (1) facilitating tax collection; (2) allowing state regulators to ensure the safety of beer sold in

the state; (3) preventing underage drinkers from accessing beer; and (4) reducing the risk of increased beer consumption and its associated societal harms. *See* (ECF No. 110 at ¶¶ 65–72). As the Supreme Court has repeatedly explained, however, "'mere speculation' or 'unsupported assertions' are insufficient to sustain a law that would otherwise violate the Commerce Clause." *Tenn. Wine*, 588 U.S. at 539 (quoting *Granholm*, 544 U.S. at 490). In this case, Defendants presented almost no concrete evidence to support their speculation that allowing out-of-state breweries to obtain direct delivery permits would result in delivery of unsafe beer, increase consumption, or increase underage drinkers' access to beer. Moreover, at least one of Defendants' witnesses acknowledged that nondiscriminatory alternatives exist to allow the State to preserve its interest in tax collection.

> **b. Nondiscriminatory alternatives would allow the state to preserve its interest in tax collection without discriminating against out-of-state manufacturers.**

First, although Defendants have raised a legitimate concern as to the State's interest in tax collection, they have not shown that nondiscriminatory alternatives fail to serve that interest. Tax collection is a legitimate state interest that may justify some discrimination against out-of-state commerce, but a state must show that the threat of tax evasion justifies discrimination. *Granholm*, 544 U.S. at 492; *Sarasota Wine Mkts.*, 987 F.3d at 1180. Put differently, to justify a discriminatory alcohol law based on an interest in tax collection, a state must demonstrate that nondiscriminatory alternatives would fail to address the risk of tax evasion. *Granholm*, 544 U.S. at 492; *see also Beskind*, 325 F.3d at 516 (requiring state to show that interest in tax collection could not be served by reasonable, nondiscriminatory alternative). Generally federal licensing requirements that condition manufacturers' licenses on compliance

with state laws and reporting requirements associated with state licenses are sufficient to protect a state's interest in tax collection. *See Granholm*, 544 U.S. at 492.

As detailed above, Maryland ensures that beer manufacturers pay required taxes in two ways. First, for manufacturers who sell their products to wholesalers, the ATCC monitors tax payment by comparing manufacturers' reported sales of alcohol by volume with wholesalers' records of alcohol purchases and the State Comptroller's tax records. (ECF No. 106 at 17:16–19 (Mr. Kelly); at 125:9–15 (Dr. Kerr).)    Second, for manufacturers who do not use wholesalers, the State requires direct delivery permitholders to submit separate and compiled reports of each direct delivery, and the ATCC then compares those reports with the manufacturers' records of alcohol production by volume to ensure that the proper taxes have been paid. (*Id.* at 88:10–25 (Mr. Kelly).)  At trial, Mr. Kelly testified that it is infeasible to apply these comparison systems to out-of-state manufacturers because such manufacturers are not required to submit to the State of Maryland annual reports of the volume of alcohol they brew. (*Id.* at 76:12–77:12, 84:10–22, 88:10–89:6 (Mr. Kelly).)   Additionally, Defendants presented testimony that direct delivery or shipping by out-of-state alcohol manufacturers tends to increase the amount of untaxed alcohol entering a state. *See* (*id.* at 135:2–16, 137:10–138:24, 139:17–140:16 (Dr. Kerr) (explaining study that found that, after enactment of laws allowing direct shipping by out-of-state wineries, tax avoidance increased from two percent of wine to about eleven percent of wine shipped from out of state); *id.* at 141:1–10 (Dr. Kerr) (testifying that the same tax avoidance patterns and concerns present in the interstate shipment of wine likely apply to the interstate delivery of beer).)   The State has shown, therefore, that direct

delivery by out-of-state manufacturers raises some concern regarding its legitimate interest in tax collection.

Nevertheless, Defendants admitted that "their regulatory objectives can be achieved without discriminating against interstate commerce." *Granholm*, 544 U.S. at 491. The State of Maryland protects its interest in tax collection from out-of-state wine producers engaged in direct shipping by requiring out-of-state wineries to post a $1,000 bond at the time they receive their direct-shipping permit. (ECF No. 106 at 51:10–23 (Mr. Kelly).) Mr. Kelly testified that the ATCC could apply this bond system to out-of-state breweries to ensure payment of taxes, but it would create more work for the ATCC. (*Id.* at 75:6–11, 76:22–77:9 (Mr. Kelly)). Indeed, he testified that the specific method by which the ATCC tracks tax payments constitutes a policy decision left to the General Assembly. (*Id.* at 77:3–14, 74:25–5 (Mr. Kelly).) Thus, although Defendants presented evidence that the system presently used to ensure tax payment by in-state beer manufacturers engaged in direct delivery would not easily apply to out-of-state manufacturers, the ATCC *could* apply to out-of-state beer producers the bond payment system presently applied to wine producers. (*Id.* at 51:10–13, 76:12–77:9 (Mr. Kelly)). Indeed, as discussed above, the direct delivery permit already requires manufacturers to keep records of each direct delivery and submit annual reports compiling direct deliveries, which would facilitate confirmation of tax payment. *See* (ECF No. 105 at 217:25–218:8 (Mr. Kelly)); DE10.

In short, therefore, Defendants could apply to out-of-state beer manufacturers the existing tax collection system for out-of-state wineries engaged in direct shipping. Put differently, they could apply a reasonable, nondiscriminatory alternative already in use as to out-of-state wineries to alleviate the concern that out-of-state manufacturers will evade

required tax payments. The existence of such reasonable nondiscriminatory alternatives precludes a finding that Defendants have met their burden under the dormant Commerce Clause doctrine. *Granholm*, 544 U.S. at 490; *Tenn. Wine*, 588 U.S. at 540 (citing *Granholm*, 544 U.S. at 490). Moreover, as the Supreme Court noted in relation to wine producers in *Granholm*, manufacturers are required to obtain federal basic permits, which require adherence to state laws. *See* 544 U.S. at 492; 27 U.S.C. § 204(c)–(d) (discussing basic permits and stating that such permits are "conditioned upon compliance . . . with the Twenty-first Amendment and laws relating to the enforcement thereof . . ."). These federal requirements provide an additional layer of protection to Maryland's tax collection interest by incentivizing compliance with Maryland's tax requirements. *See Granholm*, 544 U.S. at 492. Ultimately, Defendants have acknowledged that they could apply reasonable, nondiscriminatory alternatives—at least in the form of the bond payment system presently in use relative to out-of-state wine producers—to preserve their interest in tax collection.[18] As such, they have not met their burden under the Commerce Clause and Twenty-First Amendment to justify the residency requirement based on the State's legitimate interest in collection of taxes.

---

[18] Although Defendants cited general studies that tended to show that direct wine shipping policies increase the amount of untaxed alcohol flowing into a state, (ECF No. 106 at 135:2–16, 137:10–138:24, 139:17–140:16 (Dr. Kerr)), they presented no evidence that Maryland has actually suffered lost tax revenue as a result of its direct wine shipping policies. Rather, the limited evidence in the record established that in the year following the implementation of the wine shipping permit, Maryland's revenues increased, and Maryland has maintained the direct wine shipping permit since 2011. *See* PE13 at 4. Accordingly, they have not demonstrated that the tax system presently used for direct wine shipments would be insufficient to preserve the State's interest in tax collection.

c. **There is no concrete evidence that direct delivery of beer by out-of-state manufacturers increases the risk of delivery of unsafe beer.**

Nor have Defendants shown concrete evidence that the residency requirement actually serves public health and safety by reducing the risk of delivery of beer that is unsafe for consumption. As explained above, the State bears the burden to present "concrete evidence" that its discriminatory regulations "actually serve public health and safety." *Tenn. Wine*, 588 U.S. at 540 (quoting *Granholm*, 544 U.S. at 490). In this case, Defendants presented no evidence that direct beer delivery is associated with an increased risk of delivery of beer that is unsafe for consumption. Rather, they generally argued that the ATCC's inability to inspect out-of-state breweries posed a risk that such breweries could fail to meet Good Manufacturing Practices, Good Brewing Practices, and other health and safety requirements and, therefore, could provide unsafe beer. *See* (ECF No. 110 ¶¶ 69, 70). As Mr. Kelly testified, however, the ATCC does not conduct in-depth health inspections, (ECF No. 106 at 81:8–82:2 (Mr. Kelly)), and Plaintiffs presented evidence that specified testing would be necessary to identify unsafe beer, (ECF No. 105 at 150:24–151:9 (Mr. Kuhr)). Indeed, the only food safety evidence adduced at trial showed that beer has little susceptibility to contamination and any fitness or quality concerns are limited to taste or concerns of chemical or manufacturing contaminants. (*Id.* at 144:13–146:10 (Mr. Kuhr).)

Moreover, Defendants presented no evidence that direct shipping by uninspected, out-of-state wine producers has resulted in any increase in the delivery of unsafe or contaminated wine to Maryland consumers. (ECF No. 106 at 66:6–9 (Mr. Kelly).) Nor did Defendants explain why it could not use as a reasonable, nondiscriminatory alternative to ensure beer

safety the same system of permitting that it applies to wine producers. To the contrary, Mr. Kelly acknowledged that the ATCC likely *could* apply the same system to beer producers and only does not do so at present because of unspecified resource limitations and the General Assembly's policy decisions. (*Id.* at 75:15–77:12 (Mr. Kelly)). At most, Defendants offered speculation about the risk that out-of-state breweries are not subject to the same inspection standards as in-state breweries and, therefore, may deliver sub-standard beer to Maryland consumers. (*Id.* at 82:19–83:15 (Mr. Kelly) (discussing testimony that Vortex was cited for failure to maintain records).) They offered no evidence of actual differences between Maryland's inspection system and those of other states. Nor did they present evidence that federal law requiring alcohol manufacturers to follow all state laws, 27 U.S.C. § 204(c)–(d), is insufficient to ensure out-of-state beer producers' compliance with their states' licensing and permitting laws.

Finally, Defendants have not shown that reasonable, nondiscriminatory alternatives would be insufficient to preserve any interest in public health and safety based on the risk of contaminated beer. Even if an out-of-state brewery provided poor quality beer, under the direct delivery permit system, the ATCC would be able to revoke that brewery's permit and preclude them from delivering products to in-state consumers. That is, Maryland would retain significant regulatory authority to enforce its product safety requirements. Although Mr. Kelly testified broadly that the ATCC would lack the same leverage that it enjoys over in-state breweries because it would have authority to affect only a small portion of out-of-state producers' sales, (ECF No. 106 at 41:17–42:16, 90:2–4 (Mr. Kelly)), he did not explain why the capacity to revoke permits based on provision of unsafe beer would fail to preserve the

State's interest in public safety. Finally, Mr. Kelly acknowledged that the State could apply to direct delivery by out-of-state beer producers the same protections that it presently applies to direct shipping by out-of-state wine producers, including protections as to labeling, contents, and general public health and safety. (*Id.* at 75:15–77:12 (Mr. Kelly).) The State presented no evidence that beer poses a greater contamination risk than wine, and indeed evidence in the record suggest that alcoholic beverages with higher alcohol by volume, such as wine, pose greater health risks. (*Id.* at 155:15–24, 156:4–25 (Dr. Kerr).) Under the exacting standard elucidated in *Granholm* and confirmed in *Tennessee Wine*, Defendants' "mere speculation" and "unsupported assertions" of some risk of delivery of unsafe beer are insufficient to justify a discriminatory alcohol regulation. *Tenn. Wine*, 588 U.S. at 539 (quoting *Granholm*, 544 U.S. at 490). Moreover, even if Defendants had provided the required concrete evidence establishing a public health and safety risk, they have not shown that reasonable, nondiscriminatory alternatives would fail to alleviate such risk. *Id.* at 540 (quoting *Granholm*, 544 U.S. at 490).

> **d. There is no concrete evidence that underage drinkers' access to or consumption of beer will increase if out-of-state producers can directly deliver in Maryland.**

Similarly, Defendants have not met their burden to present "concrete evidence" that direct delivery of beer by out-of-state manufacturers will increase beer access or consumption by underage drinkers. The Supreme Court considered a very similar argument in *Granholm*, in which the defendant-States argued that their bans on direct shipping by out-of-state wine manufacturers were necessary to preserve state interests in preventing underage drinking. 544 U.S. at 489–90. In this case, as in *Granholm*, Defendants presented no concrete "evidence that the purchase of [beer] over the Internet by minors is a problem." *Id.* at 490.

Defense expert Dr. Kerr testified regarding several studies that home delivery of alcohol frequently results in less rigorous age-verification than purchase of alcohol at brick-and-mortar stores, but he also testified that there is very little research on the issue of whether direct-to-consumer delivery facilitates underage drinkers' access to alcohol. (ECF No. 106 at 131:3–132:2 (Dr. Kerr).) At most, Defendants presented two studies that demonstrate that age verification is less reliable for home delivery, but those studies limited their findings to compliance with age verification and did not show any actual increase in minors' access to alcohol. DE76 (Oregon study showing noncompliance rate of approximately 37 percent); DE87 (Vermont study showing no direct shipment was completed in full compliance). Yet, the State presented no evidence of instances in which beer was directly delivered to underage drinkers and cited just a handful of instances in which wine was shipped and delivered without age verification. PE13 at 8; (ECF No. 106 at 47:18–48:1 (Mr. Kelly).) Significantly, Defendants presented no evidence that delivery by out-of-state manufacturers poses an increased or even a different risk of delivery to underage drinkers than does delivery by in-state manufacturers. Put differently, Defendants cited general trends that (1) underage drinkers prefer beer;[19] and (2) direct delivery or direct shipping tends to produce less rigorous age verification. They offered no evidence that direct delivery actually causes increased consumption by underage drinkers. Absent evidence, this Court is left with Defendants' "unsupported assertions," which are insufficient to justify a discriminatory alcohol regulation. *Tenn. Wine*, 588 U.S. at 539 (quoting *Granholm*, 544 U.S. at 490).

---

[19] Notably, although Defendants presented testimony regarding minors' general preference for beer and spirits over wine, they presented no evidence that underage drinkers are more likely to purchase beer online for direct delivery.

e. **There is no concrete evidence that consumption of beer generally will increase if out-of-state manufacturers can directly deliver beer to Maryland consumers.**

Finally, Defendants presented no "concrete evidence" that consumption of beer will increase if out-of-state manufacturers can deliver beer directly to consumers. *Tenn. Wine*, 588 U.S. at 539 (quoting *Granholm*, 544 U.S. at 490). As an initial matter, the evidence adduced at trial showed that the direct delivery permit is a small exception that only "a handful" of Maryland breweries have utilized to date. (ECF No. 106 at 84:13–22 (Mr. Kelly).) Thus, although Defendants speculated that an influx of direct deliveries by the nearly 14,000 breweries nationwide could overwhelm the in-state beer market, increase supply, correspondingly decrease prices, and therefore increase consumption, they offered no actual evidence of such a risk. (ECF No. 110 ¶¶ 48–51, 67, 71.) Indeed, they presented only general economic theories of supply and demand to support that a greater supply of beer in the market would result in greater consumption. *See, e.g.*, DE55. Defendants' expert did not conduct any actual modeling of the likely result of expanding the Direct Delivery Law to allow out-of-state breweries to deliver their beer to Maryland. (ECF No. 106 at 159:8–12 (Dr. Kerr); *see also id.* at 183:8–23 (Dr. Kerr) (suggesting that modeling is necessary to reach conclusion as to consumption trends).)

Moreover, Plaintiffs presented research that showed that beer consumption did not noticeably increase in states that authorized direct shipping or delivery by out-of-state manufacturers. PE14. Defendants' expert explained that no conclusions could be drawn from those studies because they did not control for factors such as the general decrease in beer consumption nationwide. (ECF No. 106 at 169:20–171:5 (Dr. Kerr).) Nevertheless, these

inconclusive studies underscore that Defendants have not met their burden to offer more than "mere speculation" that consumption will increase if out-of-state manufacturers can deliver directly to in-state consumers. *Tenn. Wine*, 488 U.S. at 539 (quoting *Granholm*, 544 U.S. at 490). Defendants presented no evidence that direct delivery by out-of-state breweries results in increased consumption. Accordingly, Defendants have not met their burden to justify the discriminatory residency requirement under the Twenty-First Amendment.

### ii.  Count II: Employee-Delivery Requirement

Nor have Defendants met their burden to justify the employee-delivery requirement and associated ban on delivery by common-carrier.[20]  Defendants sought to justify the employee-delivery requirement by asserting that it is necessary to prevent access to beer by underage drinkers. Specifically, Defendants presented testimony that the connection between breweries and their local communities and the requirement that employees complete alcohol awareness training to engage in direct delivery are necessary to prevent underage drinkers from accessing beer via direct delivery. *See, e.g.*, (ECF No. 105 at 34:3–9, 37:18–40:17, 41:11–25, (Ms. Durbin); ECF No. 106 at 21:8–22:2, 34:10–35:18 (Mr. Kelly)).  As discussed above, Defendants also presented evidence that home delivery is associated with less rigorous age verification than in-person sales at a brick-and-mortar retailer. (ECF No. 106 at 129:22–131:10

---

[20] As noted above, Defendants did not appear to contend that the employee-delivery requirement challenged in Count II was essential to Maryland's three-tier system of alcohol regulation. To the extent they intended to raise such an argument, however, they have not met their burden. A law that modifies or dictates the method of delivery has no relation to the flow of alcohol from producers to wholesalers to retailers. *See B-21 Wines*, 36 F.4th at 227 (discussing flow of alcohol through three-tier system).  Rather, independent of the three-tier system, the employee-delivery requirement and ban on common carrier shipping relates to how alcohol is provided to the consumer.  Indeed, under Maryland's three-tier system, the provision of alcohol to the consumer occurs *after* alcohol has moved through that system.  Thus, the employee-delivery requirement does not implicate the three-tier system itself and, as such, cannot be "an essential feature" of that system. *Id.* at 228 (citing *Tenn. Wine*, 588 U.S. at 535).

(Dr. Kerr)); (DE76; DE 87). Thus, although the testimony regarding community connection appeared to be based wholly on witnesses' personal speculation or experience, Defendants offered some concrete evidence that home delivery poses an increased risk of improper age verification. Yet, defense expert Dr. Kerr conceded that there is little research as to the effects of common carrier delivery, (ECF No. 106 at 150:25–151:6 (Dr. Kerr)). Additionally, and perhaps most importantly, Defendants presented no evidence other than speculation regarding local employees' community affinity that common carriers are more likely than employees to deliver alcohol to minors.

Furthermore, Defendants have not established that they would be unable to address any age verification concerns via nondiscriminatory alternatives already in use as to direct shipment of wine. As explained above, Maryland already allows in-state and out-of-state wineries to deliver wine via common carriers who have obtained the appropriate permit in Maryland. MD. CODE ANN., ALC. BEVS. & CANNABIS §§ 2-142–2-156, § 2-151 (creating common carrier permit for direct wine shipment). This common carrier permit includes a requirement that permitted common carriers submit training information to the ATCC upon request. *Id.* § 2-151(g). Defendants have not explained why a similar requirement would be insufficient as to beer. Indeed, Mr. Kelly testified that Maryland previously allowed direct delivery of beer by common carrier between 2021 and 2024, and he was aware of only one instance during that period in which a common carrier delivered beer without proper age verification. (ECF No. 106 at 78:2–14 (Mr. Kelly).) Moreover, as noted above, Mr. Kelly admitted that the ATCC could likely apply the direct wine shipping policies to out-of-state beer producers. (*Id.* at 75:15–77:12 (Mr. Kelly).) Defendants have not met their burden to

demonstrate that the State's legitimate interest in preventing underage beer consumption is implicated by common carrier delivery. Alternatively, even assuming they have established that common carrier delivery creates such a risk, they have not shown that reasonable, non-discriminatory alternatives such as those presently applied to direct wine delivery could not sufficiently address that risk. *Granholm*, 544 U.S. at 490.

### F. Remedy

Finally, having concluded that (1) the challenged Direct Delivery Law discriminate against out-of-state beer manufacturers in violation of the dormant Commerce Clause doctrine and (2) such Laws are not justified by legitimate interests under the Twenty-First Amendment, the Court turns to the appropriate remedy. Plaintiffs argue that the Direct Delivery Law should be declared unconstitutional and enforcement of the residency requirement and employee-delivery requirement enjoined. (ECF No. 109 at 22–23.) Defendants contend, however, that the appropriate remedy is to enjoin the Direct Delivery Law altogether such that no beer manufacturers—whether in- or out-of-state—may directly delivery beer to Maryland consumers. (ECF No. 110 ¶¶ 73.) The choice of remedy lies within this Court's discretion, as guided by the below principles.

Where a state regulation violates the dormant Commerce Clause doctrine, two separate paths exist to remedy the violation: (1) extension of the challenged benefit to include out-of-state interests, or (2) nullification of the benefit altogether. *Califano v. Westcott*, 443 U.S. 76, 82 (1979); *Heckler v. Mathews*, 465 U.S. 728, 740 (1984) ("[W]hen the 'right invoked is that of equal treatment,' the appropriate remedy is a mandate of *equal* treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of

benefits to the excluded class." (quoting *Iowa-Des Moines Nat'l Bank v. Bennett*, 284 U.S. 239, 247 (1931)).    Under the extension approach, a court may expand the discriminatory law by striking down its restriction to in-state producers such that the challenged benefit is extended to both in- and out-of-state producers. *Beskind*, 325 F.3d at 518–20.    Alternatively, under the nullification approach, a court may strike down the discriminatory law such that neither in-state producers nor out-of-state producers receive the challenged benefit. *Id.*; *Califano*, 443 U.S. at 82.

The Supreme Court has counseled that "[o]rdinarily . . . 'extension, rather than nullification, is the proper course.'" *Sessions v. Morales-Santana*, 582 U.S. 47, 74 (2017) (quoting *Westcott*, 443 U.S. at 89).    "The choice between these outcomes is governed by the legislature's intent, as revealed by the statute at hand." *Id.* at 73.    A district "court should 'measure the intensity of commitment to the residual policy . . . and consider the degree of potential disruption of the statutory scheme that would occur by extension as opposed to abrogation.'" *Id.* at 75 (quoting *Heckler*, 465 U.S. at 739 n.5).    Additionally, in the context of alcohol regulations, the Fourth Circuit has suggested that courts should be mindful "to take the course that least destroys the regulatory scheme that [the State] has put into place pursuant to its powers under the Twenty-first Amendment." *Beskind*, 325 F.3d at 519.

In this case, Defendants have explicitly requested that any remedy in favor of Plaintiffs result in nullification, rather than extension, of the Direct Delivery Law. (ECF No. 110 ¶ 73.) They argue that the decision to extend direct delivery privileges to out-of-state manufacturers is most appropriately left to the Maryland General Assembly. (*Id.*)  The General Assembly, however, has consistently expanded direct-to-consumer delivery or shipping.  First, the State

created a direct wine shipping permit in 2011, which allows in- and out-of-state wine producers to ship their products directly to consumers in Maryland. *See* (ECF No. 106 at 62:4–63:18, 64:12–18, 66:16–70:25, 72:15–21 (Mr. Kelly)); (ECF No. 105 at 220:10–221:13 (Mr. Kelly)); PE15; DE08; MD. CODE ANN., ALC. BEVS. & CANNABIS §§ 2-142–2-156. Second, in 2021, the State authorized in-state beer producers to deliver their products directly to Maryland consumers in the original version of the Direct Delivery Law challenged in this case. *See* (ECF No. 106 at 78:2–14 (Mr. Kelly)). The General Assembly twice extended that law before enacting the Direct Delivery Law at issue here. Thus, the General Assembly has repeatedly evinced intent to expand direct shipment or delivery of alcohol to in-state consumers.

Nor would extending the direct delivery permit disrupt Maryland's three-tier regulatory system. The preamble to the challenged Direct Delivery Law provides that "[i]t is the intent of the General Assembly to limit the issuance of direct delivery permits by the Office of the Executive Director to licensed Maryland manufacturers in order to protect public health and provide strong incentives not to sell alcohol in a way that threatens public health or safety . . . ." 2024 Md. Laws ch. 918 (S.B. 1041); PE17. Thus, there is no evidence that Maryland has abandoned its three-tier system of alcohol regulation or intended to alter that system by enacting the Direct Delivery Law. As the Fourth Circuit has observed, "it causes less disruption to [the State's Alcoholic Beverages and Cannabis] laws to strike [a] single provision . . . creating the local preference . . . as unconstitutional and thereby leave in place the three-tiered regulatory scheme . . . ." *Beskind*, 325 F.3d at 519. "[A]s a matter of comity and harmony," this Court is "duly bound to give effect to [the State's alcohol policy pursuant to the Twenty First Amendment], disturbing only as much of the State regulatory scheme as

is necessary to enforce the U.S. Constitution." *Id.* In this case, Defendants explained that the direct delivery permits are a limited exception to the State's three-tier system. Extending that exception to out-of-state producers would not disrupt the three-tier system any more than the existing exception for in-state producers.

Importantly, however, the Court declines to grant Plaintiffs' request for a declaration that the State of Maryland's residency requirement for manufacturers—which is codified in a separate portion of Maryland's Alcoholic Beverages and Cannabis Code and exists independently of the challenged Direct Delivery Law—is unconstitutional. *See* (ECF No. 35 at 9; ECF No. 109 at 23 (requesting declaratory judgment and injunction as to MD. CODE ANN., ALC. BEVS. & CANNABIS §§ 2-211, 3-102, 3-105(b))). That request extends beyond the Direct Delivery Law to nullify wholly separate provisions of Maryland's Alcoholic Beverages and Cannabis Article, *see* (ECF No. 109 at 23); MD. CODE ANN., ALC. BEVS. & CANNABIS §§ 2-211, 3-102, 3-105(b), which would severely disrupt Maryland's three tier-system by overhauling the structure by which it licenses its manufacturer and wholesaler tiers. Such disruption is both unnecessary and inappropriate in this case.

Rather, the unconstitutional discrimination presently contained in the Direct Delivery Law can be remedied by (1) extending direct delivery permits to out-of-state producers, and (2) extending delivery methods to include common carriers. Such extension is consistent with the Supreme Court's repeated determination that extension is the proper remedy to address a discriminatory statute. *See Westcott*, 443 U.S. at 82; *Heckler v. Mathews*, 465 U.S. at 740; *see also Morales-Santana*, 582 U.S. at 74 (quoting *Westcott*, 443 U.S. at 89). Furthermore, as detailed above, it is consistent with the General Assembly's broader policies tending to extend direct

delivery and shipping privileges, including to out-of-state wine producers. Finally, because the offending provisions of the Direct Delivery Law are both contained in Section 2-169(a), extension of the direct delivery permit to out-of-state producers does not significantly disrupt the regulatory scheme that Maryland has established for alcohol producers. *See Beskind*, 325 F.3d at 519 (emphasizing that courts should not disrupt state alcohol policies more than necessary). Accordingly, consistent with Supreme Court guidance and the General Assembly's intent, a remedy that extends the direct delivery permit to out-of-state producers is most appropriate in this case.

## V. Conclusion

Based on the foregoing Findings of Fact and Conclusions of law, this Court enters the following:

## ORDER

IT IS THEREFORE ORDERED AND ADJUDGED THAT Judgment shall be ENTERED in favor of Plaintiffs and AGAINST Defendants Attorney General Brown and Mr. Kelly.

A separate Judgment follows.

_Rll D. Bennett_
Richard D. Bennett
United States Senior District Judge